KATHLEEN ANN KEOUGH, P.J.:
{¶ 1} Defendants-appellants, Frederick Harris, M.D., Inc. and Frederick Harris, M.D. (collectively "appellants") appeal the trial courts decision entering judgment against them and in favor of plaintiff-appellee, SMS Financial 30, L.L.C. ("SMS") in the amount of $46,762.64, plus interest. For the reasons that follow, we affirm in part, reverse in part, and remand with instructions to the trial court.
{¶ 2} On January 20, 2016, SMS filed a complaint against Frederick Harris, M.D., Inc. ("Harris M.D.") for breach of a Small Business Line of Credit Agreement with National City Bank ("LOC"), and against Frederick Harris, M.D., individually, ("Harris") for breach of Guaranty of Payment-Waiver of Rights in favor of National City Bank ("Guaranty"). Appellants admitted that the LOC was executed, but denied the material allegations of the complaint. Appellants also challenged the validity of the assignment of the LOC to SMS and whether SMS's action was (1) time-barred, (2) seeking to collect on the wrong account, and (3) barred pursuant to R.C. 1701.87.
{¶ 3} Both parties moved for summary judgment, which the court denied in part. The court only granted summary judgment in favor of the appellants on SMS's request for attorney fees contained in the complaint. In denying appellants' request for summary judgment on the merits of the case, the trial court found that there were genuine issues of material fact regarding whether SMS's claim was barred pursuant to R.C. 1701.87, and whether the assignment of the LOC and personal guaranty to SMS was proper. The trial court found, however, that the LOC was a negotiable instrument and that the action was not time-barred under R.C. 1303.16 because the LOC was accelerated on May 1, 2012-within the six-year statute of limitations of the complaint.
{¶ 4} The matter proceeded to a bench trial where the trial court heard the following evidence.
*398 {¶ 5} On March 22, 2000, Harris, on behalf of Harris M.D., executed the LOC in the amount of $50,000 and a security agreement with National City Bank ("National City"). Pursuant to the terms and conditions of the LOC, National City would issue various loans or advances to the borrower, Harris M.D., when requested-"from time to time." This LOC was personally guaranteed by Harris, individually, and secured by a financing statement listing Harris's property and inventory. The financing statement was filed with the Ohio Secretary of State and the Cuyahoga County Recorder. At trial, appellants admitted that Harris signed the LOC on behalf of his company and that advances were drawn on the LOC.
{¶ 6} In 2013, Harris M.D. dissolved. Attorney Milton Jefferson testified that he represented appellants and assisted with the dissolution. On June 18, 2013, Attorney Jefferson sent correspondence to PNC, as successor by merger to National City, notifying it of the dissolution of the corporation and that there were no remaining assets in the corporation to be used to settle outstanding debts. Included with the correspondence were a notice of dissolution, a certificate of dissolution, and a PNC bank statement. Attorney Jefferson testified that he sent the notice by regular and certified mail. Although the certified mail return of service card was not presented at trial, he testified that PNC must have received the notice because he was contacted by PNC after the notice was sent.
{¶ 7} On October 29, 2014, SMS acquired and purchased the LOC from PNC Bank, the successor by merger to National City Bank in November 2009. Pursuant to the Loan Sale Agreement, PNC sold, assigned, and transferred any and all rights in and to the LOC to SMS. As a result of the execution of the Allonge, the General Assignment, and Loan Sale Agreement, SMS became the owner and holder of the LOC, and all reports, records, payment histories, and related documents pertaining to the LOC.
{¶ 8} Included in these records are six months of account statements issued by PNC to Harris M.D. from February 2012 to July 2012. These statements appear much like a credit card statement, depicting the previous balance, payments received, amounts advanced or "purchases," if any, credits, cash advances, late and over-limit fees, finance charges, new balance, past due amount, minimum payment due, total amount due, and due date. Additionally, the statement provides the total credit limit, total available credit, and a calculation on how interest is accruing on the account.
{¶ 9} The statements demonstrate that the last payment made by appellants was in April 2012. However, the statements do not provide when the last purchase or advance was made. Pursuant to the LOC, appellants were required to make payments on or before the due date of at least the minimum payment reflected on each periodic statement. As of May 1, 2012, appellants were in default of the terms and conditions set forth in the LOC, including the failure to pay principal, interest, and finance charges. As of the date of default and pursuant to the LOC, the interest rate changed from the contract rate of 3.25 percent to the default rate of 6.25 percent per annum.
{¶ 10} On or about October 23, 2015, SMS notified appellants through a Demand Notice that the account was in default, and as a result, any "rights, powers, privileges, and other remedies" available to SMS under the LOC, in law, or in equity "may be exercised by SMS at any time whether or not any legal action is commenced." SMS further notified appellants that it was declaring all of the indebtedness *399 evidenced by the LOC, including the Guaranty, to be immediately due and payable. As of October 16, 2015, the principal amount due was $46,762.64 with $10,633.30 in accrued interest, for a total amount due and payable of $57,395.94. Despite being notified, appellants failed and refused to pay the default balance on the LOC.
{¶ 11} Following a bench trial, the court issued a written decision entering judgment in favor of SMS and against the appellants, jointly and severally, in the principal amount of $45,762.64, plus $10,633.30 interest as of October 16, 2015, with interest accruing from that date at a rate of 6.25 percent per annum until paid in full.
{¶ 12} Appellants appeal, raising as their sole assignment of error that the trial court erred when it entered judgment in favor of SMS because its claims were barred and otherwise unenforceable. Specifically, appellants raise four issues for this court to review: (1) whether a creditor who fails to make a claim before the R.C. Title XVII statutory deadline can later attempt to enforce that claim against a corporation that has been legally dissolved under R.C. Title XVII; (2) whether a cause of action based upon a negotiable instrument is time-barred when it is filed more than six years after the instrument is due, accelerated, and/or in default; (3) whether SMS may maintain an action to enforce a negotiable instrument when it cannot establish that the specific negotiable instrument is the same instrument that was assigned to it; and (4) whether a personal guaranty on a negotiable instrument is enforceable when the underlying debt has been, at some point, fully paid and when the guaranty's underlying debt has been released by operation of law.
I. Statute of Limitations
{¶ 13} The parties filed cross-motions for summary judgment. One basis upon which the appellants moved for summary judgment was that SMS's complaint was time-barred. They maintained that the LOC was a negotiable instrument and thus subject to the relevant six-year statute of limitations. See R.C. 1303.16(a). SMS opposed appellants' motion, contending that the LOC was not a negotiable instrument and thus was subject to the relevant statute of limitations for a written contract. See R.C. 2305.06. In its written decision denying appellants summary judgment, the trial court found that the LOC was a negotiable instrument and subject to a six-year statute of limitations, but that the LOC was accelerated on May 1, 2012, which was within the statute-of-limitations period.
{¶ 14} Appellants contend on appeal that while the court was correct in determining that the LOC was a negotiable instrument subject to a six-year statute of limitations, the court was incorrect in its finding that the complaint was filed within that time period because PNC made an automatic demand for payment in 2009 when it terminated the LOC. SMS maintains on appeal, as it did in the trial court, that the LOC is not a negotiable instrument, but even if it were, the complaint was filed within the relevant six-year statutory period because acceleration of the LOC occurred at the earliest in May 2013, and at the latest in October 2015.
A. Is the LOC a Negotiable Instrument?
{¶ 15} R.C. 1303.03(A) defines a negotiable instrument.
[A] "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in *400 the promise or order, if it meets all of the following requirements:
(1) It is payable to bearer or to order at the time it is issued or first comes into possession of a holder.
(2) It is payable on demand or at a definite time.
(3) It does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain any of the following:
(a) An undertaking or power to give, maintain, or protect collateral to secure payment;
(b) An authorization or power to the holder to confess judgment or realize on or dispose of collateral;
(c) A waiver of the benefit of any law intended for the advantage or protection of an obligor.
See Calvary SPV I, LLC v. Krantz , 8th Dist. Cuyahoga No. 97422, 2012-Ohio-2202, 2012 WL 1758400, citing U.C.C. 3-104 (1972) (a negotiable instrument is a writing signed by the maker, containing an unconditional promise to pay a sum certain in money, on demand or at a definite time, to the order of a particular person or entity or to the bearer); Fed. Deposit Ins. Corp. v. Wood , 758 F.2d 156, 160 (6th Cir.1985), citing Mich. Comp. Laws Ann. 440.3104 (1967) ; U.C.C. 3-104 (1972) (a negotiable instrument, such as a note, is a writing signed by the maker, containing an unconditional promise to pay a sum certain in money, on demand or at a definite time, to order or to bearer); Enoch v. Brandon , 249 N.Y. 263, 164 N.E. 45 (1928) (negotiable instrument must contain an unconditional promise to pay a fixed sum, on demand, or at a fixed or determinable future time, to order or to bearer).
{¶ 16} Case law exists, however, suggesting that an open-end line of credit, or revolving line of credit, is not a negotiable instrument because the amount advanced under the agreement may not be fixed or determined with certainty, or without reference to other documents. See Yin v. Soc. Natl. Bank Ind. , 665 N.E.2d 58, 62-63 (Ind. App. 1996) (the line of credit at issue was not a negotiable instrument because it lacked an unconditional promise to pay a sum certain); FDIC v. Musser , E.D.PA No. 12-7231, 2017 WL 878208 (Mar. 6, 2017) (promissory note supporting a revolving line of credit with a limit of $3 million to draw on but containing no fixed amount is not a negotiable instrument); Smith v. Palasades Collection, L.L.C. , N.D.Ohio No. 1:07 CV 176, 2007 WL 1039198, at *6 (Apr. 3, 2007) (negotiable instrument is a writing signed by the maker containing an unconditional promise to pay a sum certain in money on demand or at a definite time, to the order of a particular person or entity or to the bearer); Cadle Co. v. Richardson , 597 So.2d 1052 (La.App.1992) (holding that a revolving loan account is not a negotiable instrument because it does not contain an unconditional promise to pay a sum certain).
{¶ 17} In this regard, a line of credit is based on a contingency-whether the borrower draws on the credit line. Consequently, if the borrower never draws on the line of credit, nothing is owed. If the borrower does draw on the line of credit, in order to ascertain the principal owed, one must look beyond the agreement itself to calculate the amount owed, thus removing it from being classified as a negotiable instrument. Accordingly, if the LOC is not a negotiable instrument, it is merely a written contract and enforcement becomes an action on an account or contract (much like a credit card agreement). See Taylor v. First Resolution Inv. Corp., 148 Ohio St.3d 627, 2016-Ohio-3444, 72 N.E.3d 573, ¶ 116-119 (Kennedy, J., concurring);
*401 Discover Bank v. Swartz , 2016-Ohio-2751, 51 N.E.3d 694, ¶ 17 (2d Dist.) (actions based on promissory notes and credit card accounts differ because the note is a separate enforceable contract whereas credit card statements do not demonstrate the underlying contract or agreed upon terms); Lemke v. Barclays Bank Delaware , E.D.Mich No. 1:14-CV-14449, 2015 WL 3441145, at *5 (Mar. 31, 2015) (negotiable instrument is an unconditional promise to pay a fixed amount of money; credit card agreement is not a negotiable instrument).
{¶ 18} In this case, the LOC is an open-end line of credit. No fixed amount is due because the amount is determinable upon whether appellants borrowed under the line of credit. Therefore, in order to determine the amount due, the parties must look beyond the line of credit agreement, and look to the monthly statements provided by the lender. Therefore, the LOC in this case is not a negotiable instrument; thus the statute of limitations found in R.C. 1303.16(a) does not apply. In this regard, the action becomes an action on an account, to which general contract law principles apply. See Swartz at ¶ 17.
{¶ 19} R.C. 2305.06 governs the statute of limitations for a written contract. When the LOC and guaranty were executed, the statute of limitations was 15 years. See former R.C. 2305.06. However, on September 28, 2012, the statute was amended to provide that actions on written contracts are governed by an eight-year statute of limitations. R.C. 2305.06. The General Assembly explained that if the cause of action accrued prior to September 28, 2012, the statute of limitations is the lesser of 15 years from the date of accrual or eight years from September 28, 2012, the effective date of the amendment. 2012 Am.Sub.S.B. No 224, Section 4.
B. When Does the Statute of Limitations Commence?
{¶ 20} In this case, the parties disputed when the relevant statute of limitations commenced. After considering the evidence and testimony at trial, the trial court found that the LOC was not accelerated on May 1, 2012 (as originally determined at summary judgment), but on October 23, 2015, when SMS sent appellants a notice of default.
{¶ 21} Because we have determined that the LOC is not a negotiable instrument, and that general contract principles apply, this court does not necessarily need to decide exactly when the action accrued. Appellants maintained during summary judgment, at trial, and here on appeal that the "statute of limitations began to run as early as October 2009, and no later than January 8, 2010 when PNC/NCB closed appellants' account." See Appellant's appellate brief, p. 13.
{¶ 22} Assuming without deciding that appellants are correct in their assertions and we accept their argument on when the statute of limitations commenced, the action is not time-barred. SMS filed its complaint on January 20, 2016; therefore, applying the October 2009 or the January 8, 2010 accrual date, the complaint was filed within both the 15-year or 8-year statute of limitations for breach of the LOC and Guaranty of Payment and Waiver.
{¶ 23} Accordingly, the action is not time-barred as being outside the relevant statute of limitations.
II. R.C. Title XVII Deadline
{¶ 24} During trial, Attorney Jefferson testified about the notice of dissolution he sent to Harris M.D.'s creditors, including PNC. He stated that he sent the requisite notice pursuant to R.C. 1701.87 by certified mail. Although documentary evidence was not submitted supporting that Attorney *402 Jefferson sent the notice by regular and certified mail, the trial court found the testimony of Attorney Jefferson credible and accepted that he sent PNC the notice of dissolution by certified mail as required by R.C. 1701.87. Nevertheless, the trial court found in its written decision that the notice "did not state all the requirements contained within R.C. 1701.87(B)."
{¶ 25} Appellant appeals the trial court's conclusion, contending that the notification fully complied with R.C. 1701.87 and therefore, SMS is not entitled to collect on the debt because PNC did not assert its right following receipt of the notice of dissolution. SMS did not file a cross-appeal challenging any finding the trial court made, but argues on appeal that the record does not support the trial court's finding that the dissolution notice was sent by certified mail. SMS maintains that this argument is properly made although no cross-appeal has been filed because it is not being used a "sword," but rather as a "shield" to protect the court's determination that SMS is entitled to collect on the debt. See Loewenstine v. Delta Air Lines, Inc. , 7 Ohio App.3d 185, 186-187, 455 N.E.2d 3 (1st Dist.1982), citing Parton v. Weilnau , 169 Ohio St. 145, 171, 158 N.E.2d 719 (1959).
{¶ 26} R.C. 1701.87 requires a corporation to give "notice of a dissolution by certified or registered mail, return receipt requested, to each known creditor and to each person that has a claim against the corporation, including claims that are conditional, unmatured, or contingent upon the occurrence or nonoccurrence of future events." R.C. 1701.87(A). The notice shall provide:
(1) That all claims shall be presented in writing and shall identify the claimant and contain sufficient information to reasonably inform the corporation of the substance of the claim;
(2) The mailing address to which the person must send the claim;
(3) The deadline, which shall be not less than sixty days after the date the notice is given, by which the corporation must receive the claim;
(4) That the claim will be barred if the corporation does not receive the claim by the deadline;
(5) That the corporation may make distributions to other creditors or claimants, including distributions to shareholders of the corporation, without further notice to the claimant.
R.C. 1701.87(B)(1)-(5). A claim is barred if a claimant given written notice under R.C. 1701.87(A) does not deliver the claim to the dissolved corporation by the deadline stated in the notice. R.C. 1701.87(D).
{¶ 27} In this case, the evidence and testimony demonstrate that the notice of dissolution was properly sent to PNC pursuant to R.C. 1701.87. The cover letter dated June 18, 2013, that was sent to PNC by Attorney Jefferson provided that the notice of dissolution and a PNC Bank Statement were included as enclosures. The notice, which was a fill-in-the-blank Form 561, titled "Notice of Dissolution to Creditors and Claimants against Corporation (pursuant to [R.C.] 1701.87 )," provided the following information: (1) all claims shall be presented in writing and shall identify the claimant and contain sufficient information to reasonably inform the corporation of the substance of the claim; (2) the mailing address to which the person must send the claim is, which was Harris's personal mailing address; (3) the deadline by which the corporation must receive the claim is sixty days after the date this notice is given; and (4) that the claim will be barred if the corporation does not receive the claim by the deadline. The notice also advised that "[t]he corporation may make distributions to other creditors or claimants, including distributions to shareholders of the corporation, without further *403 notice to the claimant." These notifications mirror those contained in R.C. 1701.87(B).
{¶ 28} Accordingly, we find that the notice sent to PNC by Attorney Jefferson included the mandatory requirements of R.C. 1701.87. The trial court erred in its finding that the requirements were not satisfied.
{¶ 29} We find, however, that the trial court did not err in determining that the notice was sent by certified mail. Attorney Jefferson testified that he sent the notice by regular and certified mail. The trial court found this testimony credible, and nothing in the record refutes this finding. Although SMS contends that the court erred in making this finding because no evidence was presented corroborating Attorney Jefferson's testimony, we recognize that the trier of fact is in the best position to determine credibility of the witnesses. State v. DeHass , 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Moreover, in weighing the evidence, this court "must always be mindful of the presumption in favor of the finder of fact." Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, citing Seasons Coal Co., Inc. v. Cleveland , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, fn. 3 (1984).
{¶ 30} Accordingly, the weight of the evidence shows that Harris M.D. complied with R.C. 1701.87. No evidence was presented and no argument was made with the trial court that PNC delivered its claim to Harris M.D. prior to the 60-day deadline stated in the notice. Because Harris M.D. dissolved and PNC did not deliver its claim to the corporation by the deadline stated, the trial court erred in entering judgment against Harris M.D. Pursuant to R.C. 1701.87(D), the claim is forever barred against Harris M.D.
{¶ 31} However, the dissolution of a corporation does not dissolve Harris's personal guaranty under the LOC because he personally guaranteed the LOC independent of any promise by his business. Therefore, the dissolution of the corporation is of no consequence to Harris's individual liability by virtue of the Guaranty.
{¶ 32} "A guaranty is a promise by one person to pay the debts of another." Valspar Corp. v. Nguyen , 5th Dist. Delaware No. 11 CAE 12 0116, 2012-Ohio-2710, 2012 WL 2261010, ¶ 15, citing 52 Ohio Jurisprudence 3d, Guaranty and Suretyship, Section [2]. A personal guaranty agreement is reviewed under the law of contracts and a reviewing court should give the contract's language its plain and ordinary meaning unless some other meaning is evidenced within the document. Id. , citing Alexander v. Buckeye Pipe Line Co. , 53 Ohio St.2d 241, 374 N.E.2d 146 (1978). Ohio law recognizes guaranty contracts as valid. Birdsall v. Heacock , 32 Ohio St. 177 (1877).
A contract of guaranty is "[a] collateral engagement for the performance of the undertaking of another, and it imports the existence of two different and distinct obligations-one being that of the principal debtor and the other that of the guarantor. The obligation of a guarantor is collateral and secondary to the obligation of the principal debtor. * * * The principal debtor is not a party to the guaranty, and the guarantor is not a party to the principal obligation. The undertaking of the former is independent of the promise of the latter; and the responsibilities which are imposed by the contract of guaranty differ from those which are created by the contract to which the guaranty is collateral." 52 Ohio Jurisprudence 3d, Guaranty and Suretyship, Section 3, 239 - 240.
Valspar at ¶ 21.
{¶ 33} In this case, Harris, in his individual capacity, signed the Guaranty of *404 Payments-Waiver of Rights, guaranteeing "the prompt payment of the indebtedness evidenced by and arising under the above Agreement when each payment becomes due * * *." The Guaranty specifically provides that the "lender may proceed directly against Guarantor, whether or not Lender shall have first made any presentment or demand for payment to anyone and whether or not Lender proceeds against anyone else or against security." Therefore, even if Harris M.D. was in existence, the lender could demand payment directly from Harris individually. The dissolution of Harris M.D. did not alter Harris's liability because he personally guaranteed Harris M.D.'s timely payment of the LOC. See Scioto Cty. Bd. Of Commrs./Revolving Loan Fund Bd. v. McDermott Industries, L.L.C. , 4th Dist. Scioto No. 12CA3504, 2014-Ohio-240, 2014 WL 279665, (dissolution of corporation did not alter parties' personal guaranty of corporation's payment of the note); Cascade Indust., Inc. v. Metro Pools, Inc. , 8th Dist. Cuyahoga No. 41552, 1980 WL 355104 (June 19, 1980) (personal guaranty agreement executed by former shareholders was not conditioned on their remaining officers and/or shareholders in the corporation; thus, their withdrawal from the corporation had no legal effect on the enforceability of the guaranty agreement).
{¶ 34} Accordingly, even though the notice of dissolution prevents the enforcement and collection of the debt against Harris M.D., it does not dissolve Harris of his individual obligation as a personal guarantor of the debt.
III. Is the Personal Guaranty Still in Effect?
{¶ 35} Appellants also contend that the personal guaranty is not in effect because the debt was paid off at various points of time. The trial court found that the guaranty reaches beyond the initial advances and continues to be enforceable as to any account balance, even after the LOC reaches a zero balance. We agree with the trial court's conclusion.
{¶ 36} The personal guaranty provides that Harris is individually liable for each payment that becomes due under the LOC. Specifically, it states that the guarantor:
guarantees the prompt payment of the indebtedness evidenced by and arising under the above Agreement when each payment becomes due, and approves all the provisions of the above Agreement. Guarantor's liability under this Guaranty shall remain in effect until the indebtedness evidenced by this Agreement is fully paid or until Lender gives Guarantor a written release. (Emphasis added).
The term "each" contemplates that more than one payment may become due, and in that event, the guarantor would be liable for that payment as well.
{¶ 37} Harris contends, however, that the personal guaranty was satisfied when the account reached a zero balance because the guaranty does not state that it is "continuing" or "unconditional." Harris maintains that his liability under the guaranty remained in effect until the LOC was "fully paid"-when the LOC was paid or obtained a zero balance. He contends that because the guaranty is ambiguous regarding whether the guaranty applies only to the initial advance under the LOC or all subsequent advances, the ambiguity should be construed against SMS.
{¶ 38} A personal guaranty that provides that the guarantor agreed to "personally and unconditionally" guarantee "each and every obligation * * * until paid" is an enforceable guaranty for all indebtedness.
*405 Amerisourcebergen Drug Corp. v. Hallmark Pharmacies , 10th Dist. Franklin No. 05AP-1250, 2006-Ohio-2746, 2006 WL 1495073, ¶ 13. However, this precise language is not required or mandated to render enforceable a guaranty for all indebtedness. Instead, " 'words used in a guaranty are to be interpreted in light of the surrounding circumstances and of the object intended to [be] accomplished.' " G.F. Business Equip., Inc. v. Liston , 7 Ohio App.3d 223, 224, 454 N.E.2d 1358 (10th Dist.1982), quoting Morgan v. Boyer , 39 Ohio St. 324, 326 (1883). Because a guaranty is construed in the same manner as contracts, "[a] court need not go beyond the plain language of the agreement to determine the parties' rights and obligations if the contract is clear and unambiguous." Maines Paper & Food Serv., Inc. v. Eanes , 8th Dist. Cuyahoga No. 77302, 2000 WL 1429418, at *2 (Sept. 28, 2000). A guaranty is not rendered ambiguous by the absence of certain terms if the surrounding circumstances and the object intended to be accomplished is readily apparent from the document itself.
{¶ 39} In this case, although the guaranty Harris signed is not as concise as the guaranty in Amerisourcebergen , it provides that Harris "guarantees prompt pay of the indebtedness evidenced by and arising under the above Agreement when each payment becomes due, and approves all the provisions of the above Agreement." The provisions of the LOC include the ability to obtain additional advances, and it is undisputed that Harris obtained additional advances under the LOC. The provisions of the LOC provide that it is an "open-end credit account" with an initial amount of $50,000 from which the borrower may obtain loans or advances "from time to time," and "[a]ny amount repaid will again be available to borrow." Additionally, the provisions of the LOC provide that the borrower shall at least make the minimum payment reflected on the monthly statement on or before the due date.
{¶ 40} Harris also agreed that his "liability under this Guaranty remains in effect until the indebtedness evidenced by the Agreement is fully paid or until Lender gives Guarantor a written release." Finally, Harris agreed that he "will not use, and Guarantor waives, any defense to Guarantor's direct and absolute obligation to pay the indebtedness evidenced by this Agreement when due, together with any interest accruing on the indebtedness evidenced by this Agreement." Despite agreeing to make each payment as it became due, Harris also agreed to waive any defenses against paying the obligation.
{¶ 41} A line of credit functions much like a credit card where a maximum amount is available for use over a period of time and the borrower can borrow against that amount as needed. The payments are made based on the amount that is borrowed against the overall line of credit. Unlike a loan secured by a promissory note where an amount is disbursed in a lump sum, has a fixed or variable rate of interest, and a fixed repayment term, the amount to be repaid under a line of credit is dependent on the amount borrowed against it. Therefore, by the very nature of the LOC, the balance could reach zero on multiple occasions. The Guaranty unambiguously encompasses all indebtedness under the LOC.
{¶ 42} Reviewing the Guaranty in the context of the entire LOC, the trial court's finding that the guaranty was still in effect even after the account obtained a zero balance at one point during the life of the account, was not against the manifest weight of the evidence.
{¶ 43} Accordingly, we find that the trial court did not err in finding that the personal guaranty was still in effect.
IV. Is this the Correct Debt?
{¶ 44} The appellants further contend that SMS has failed to show that the *406 LOC governs the debt they are attempting to collect. Specifically, appellants contend that the alleged account number on the LOC does not match the account number on the assigned debt or bank statements. Appellants contend this is significant because appellants allegedly had multiple lines of credit with National City. The trial court concluded that the SMS was collecting the correct debt. We agree.
{¶ 45} A review of the evidence shows that handwritten numbers appear on the top of the first page of the LOC and the UCC financing statement filed with the Ohio Secretary of State and the Cuyahoga County Recorder. No testimony or evidence was presented regarding what the handwritten numbers represented. However, appellants contend that these numbers represent the account number assigned to the LOC with National City. Harris also testified that the handwritten number on the LOC was the account number assigned to this LOC.
{¶ 46} However, no evidence was presented by appellants to establish that the handwritten numbers on the LOC were in fact the account number assigned to the LOC. Had appellants believed that SMS was collecting on the wrong debt, they could have provided evidence demonstrating that additional accounts existed with National City Bank. From the record, it appears that at the very least appellants could have presented such evidence from an Experian Credit Report included in the file SMS obtained during its purchase of the account from PNC. See generally Knox Cty. Local Emergency Planning Commt. v. Santmyer Oil Co. , 5th Dist. Knox No. 01CA0035, 2002-Ohio-3590, 2002 WL 1465896, ¶ 37 (in civil case, where a preponderance of the evidence is the burden of proof, there remains some responsibility on the defendant to refute the evidence presented).
{¶ 47} A review of the exhibits submitted at trial reveals that while the handwritten numbers and the account number on the PNC bank statements and Schedule of Loans do not match, what does match and remains consistent and constant is the UCC financing statement file number assigned by the Ohio secretary of state. This evidence demonstrates that SMS is collecting on the correct debt.
{¶ 48} On May 12, 2000, a financing statement was filed by National City with the Ohio secretary of state bearing the unknown handwritten number of "5482219243014020," which is the same number handwritten on the LOC application. As part of the filing, the secretary of state assigned a file number to the financing statement-"AP0240976." A continuation of the UCC financing statement was filed on November 17, 2004 by National City containing the initial file number of "AP0240976." On the continuation, the "Filers Unique ID is "[xxxxxxxxxxxx]4574," which is the same number that appears on the National City bank statements, the PNC bank statements, and the Schedule of Loans that PNC sold to SMS Financial. On December 1, 2009, National City filed another continuation of the UCC financing statement, again noting the initial file number of "AP0240976" and again noting the account number ending in 4574. At all times, the secretary of state file number remained consistent.
{¶ 49} Additionally, we note that on the bottom of the pages of the LOC, the financing statement filed with the Ohio secretary of state, and the financing statement filed with the Cuyahoga County Recorder's Office, the documents bear a fax number, the name "National City Bank," and the date of March 22, 2000, which is the date the LOC was executed.
{¶ 50} In light of evidence that the LOC and UCC filing bears this faxed date, contains *407 a secretary of state file number that remains constant throughout all the continuations filed, and the continuations bear the account number that SMS is attempting to collect on, the trial court's decision was not against the manifest weight of the evidence.
{¶ 51} When conducting a manifest weight review, this court reviews the entire record, " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting Tewarson v. Simon , 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001).
{¶ 52} Based on the record before this court, we find that the evidence presented at trial allowed the trial court to reasonably conclude that the LOC containing the personal guaranty governs the debt upon which SMS is attempting to collect. The manifest weight of the evidence reveals that the trial court did not lose its way and create such a manifest miscarriage of justice that the judgment must be reversed. Accordingly, the assignment of error is affirmed in part, and reversed in part.
{¶ 53} Judgment affirmed in part, reversed, in part, and remanded for the trial court to modify its judgment by entering judgment in favor of SMS Financial and only against Frederick D. Harris, M.D., personally.
ANITA LASTER MAYS, J., and LARRY A. JONES, SR., J., CONCUR.