**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

APRIL 30, 2026

*Stgne, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 30, 2026

*Sarah Pendleton*

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON IN<br><br>GABRIEL MARQUEZ VARGAS,<br><br>Plaintiff,<br><br>v.<br><br>RRA CP OPPORTUNITY TRUST 1, REAL TIME RESOLUTIONS, INC., and NORTH STAR TRUSTEE, LLC,<br><br>Defendants. | No. 103735-0<br><br>EN BANC<br><br>Filed: <u>April 30, 2026</u> |

GORDON McCLOUD, J.—When a homeowner defaults on a home loan secured by a deed of trust, the lender (or a proper successor) can sometimes foreclose on and sell the property in a trustee's sale without judicial or court involvement. That carries some risks for the homeowner.

To protect against those risks, Washington's deed of trust act (DTA) requires that prior to initiating a nonjudicial foreclosure and trustee's sale, the trustee must "have proof that the beneficiary [the party seeking to foreclose]

is the *holder* of any promissory note or other obligation secured by the deed of trust." RCW 61.24.030(7)(a) (emphasis added). A sworn declaration by the beneficiary "stating that the beneficiary is the *holder* of any promissory note or other obligation secured by the deed of trust" constitutes sufficient proof. *Id*. (emphasis added).

Plaintiff Gabriel Marquez Vargas bought a home and executed a home equity line of credit (HELOC) agreement secured by a deed of trust on that home. He defaulted, and alleged beneficiary, defendant RRA CP Opportunity Trust 1 (RRA), directed the trustee, defendant North Star Trustee LLC (NST), to initiate nonjudicial foreclosure proceedings. Defendant Real Time Resolutions Inc. (RTR), the loan servicer, executed a beneficiary declaration on behalf of RRA, saying just what the statute permits an alleged beneficiary to say to avoid judicial foreclosure: that RRA was the "holder" of Marquez Vargas' HELOC agreement.

But that declaration works only if RRA can be the "holder"—a technical term—of the type of loan agreement—a HELOC—at issue here. Under Washington's DTA, RRA can certainly be the holder of a "negotiable instrument." But Marquez Vargas argues that one cannot be the holder of a nonnegotiable instrument and that the HELOC agreement at issue here,

though masquerading as a typical mortgage, is really just a revolving line of credit that is, by definition, nonnegotiable.

Marquez Vargas filed suit in federal court to block the sale. The federal court knew that he was raising questions of state law that this court—the state's highest court—had not yet decided. The federal court therefore certified the questions to us to answer. We accepted the certification. Our answer is that we agree with Marquez Vargas on both points.

First, the HELOC agreement is nonnegotiable. To be "negotiable," an instrument must contain an "unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." RCW 62A.3-104(a). The HELOC agreement at issue here provides that the borrower may request loans up to a stated credit limit—but it does not state the amount actually advanced to the borrower. Marquez Vargas' HELOC agreement—like all HELOCs and revolving lines of credit of this sort—therefore flunks the negotiability test. It is not a negotiable instrument.

Second, under Washington's DTA, RRA cannot be the "holder" of a nonnegotiable instrument. The plain language of the relevant statutes, in context, combined with our prior case law interpreting that language, compel

the conclusion that "holder" in this context means the holder of a negotiable instrument as defined in the UCC.[1]

Because the HELOC agreement is not a negotiable instrument, alleged beneficiary RRA cannot be its "holder." Thus, RRA cannot proceed with nonjudicial foreclosure and sale because it cannot truthfully prove what RCW 61.24.030(7)(a) requires an alleged beneficiary who seeks nonjudicial foreclosure to prove: that it is the "holder" of the HELOC agreement that is secured by the deed of trust upon which it seeks to foreclose.

This conclusion does not deprive RRA of other, judicial, remedies.

BACKGROUND, FACTS, AND PROCEDURAL HISTORY

I.      Background on the DTA

The legislature enacted the DTA in 1965. The statutory deed of trust is a type of mortgage. *Bain v. Metro. Mortg. Grp., Inc.*, 175 Wn.2d 83, 92-93, 285 P.3d 34 (2012) (quoting 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 17.3, at 260 (2d ed. 2004)). "'More precisely, it is a three-party transaction in which land is conveyed by a borrower, the "grantor," to a "trustee," who holds title in trust for a lender, the "beneficiary," as security for credit or a loan the lender has

---

[1] Uniform Commercial Code, ch. 62A RCW.

given the borrower.'" *Id.* (quoting 18 STOEBUCK & WEAVER, *supra*, § 17.3, at 260).

The DTA defines "beneficiary" as "the holder of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation." RCW 61.24.005(2). "Traditionally, the 'beneficiary' of a deed of trust is the lender who has loaned money to the homeowner." *Bain*, 175 Wn.2d at 88. "Lenders, of course, have long been free to sell that secured debt, typically by selling the promissory note signed by the homeowner." *Id.* By using the "broad[]" term "beneficiary," rather than "lender," the DTA "recognizes that the beneficiary of a deed of trust at any one time might not be the original lender." *Id.*

"[T]he key feature of the deed of trust statute is that a deed of trust may be foreclosed nonjudicially by trustee's sale," whereas a traditional mortgage can be foreclosed only judicially. 18 STOEBUCK & WEAVER, *supra*, § 20.1, at 114 (Supp. 2025). If the deed of trust grants the trustee the power of sale and the borrower defaults, the beneficiary may direct the trustee to foreclose the deed of trust and sell the property in a trustee's sale. *Bain*, 175 Wn.2d at 93; RCW 61.24.020. But the DTA imposes many procedural prerequisites to such a trustee's sale. One of those prerequisites is at issue in this case: the

requirement that "before the notice of trustee's sale is recorded, transmitted, or served, the trustee shall have proof that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust." RCW 61.24.030(7)(a). A sworn declaration by the alleged beneficiary that it is the holder of the note or other obligation is sufficient proof. *Id*.

In enacting RCW 61.24.030(7)(a), "[t]he legislature's clear purpose was to ensure the party with the *authority to enforce and modify the note* is the party engaging in mediation and foreclosure." *Brown v. Dep't of Commerce*, 184 Wn.2d 509, 543, 359 P.3d 771 (2015). This provision reflects the axiom of mortgage law that the "'obligation and mortgage cannot be split, meaning that the person who can foreclose the mortgage must be the one to whom the obligation is due.'" *Bain*, 175 Wn.2d at 97 (quoting 18 STOEBUCK & WEAVER, *supra*, § 18.18, at 334).

II.     Background on negotiable instruments and the UCC

A negotiable instrument (or note)[2] is a type of contract to pay money that meets specific formal requirements. In essence, a negotiable note is a contract that states its essential terms on its face, such that "a buyer of the note

---

[2] This opinion uses the term "instrument" interchangeably with the term "note" or "mortgage note," modifying the term with "negotiable" or "nonnegotiable" as appropriate.

can rely on its enforcement without resort to additional documentation." *HSBC Bank USA, N.A. v. Thomas*, 46 Misc. 3d 429, 433, 999 N.Y.S.2d 671 (Sup. Ct. 2014).

Negotiable notes possess key features that make them very useful in commerce. First, the right to enforce (collect payment on) a negotiable note is transferred by physical delivery of the note,[3] and second, if the transferee takes the note in good faith and for value, without notice of defenses that the maker of the note might have, the transferee is considered a "holder in due course" and obtains immunity from certain defenses that the maker could otherwise raise. Dale A. Whitman, *Transferring Nonnegotiable Mortgage Notes*, 11 FLA. A&M U. L. REV. 63, 65 (2015).

"Until 1861, there was no government-issued paper money to serve as legal tender, and notes issued by private banks were the primary medium of exchange" in the United States. *Id.* The two key characteristics of negotiability mentioned above were "indispensable to the use of private bank notes as currency." *Id.* Transferability by delivery meant that no separate transaction was necessary to transfer rights in the note; "it could simply be handed over." *Id.* And immunity from the maker's defenses "meant that one who accepted a

---

[3] The term "negotiable" refers to this characteristic of being transferable by physical delivery alone. *See* RCW 62A.3-201.

bank note as currency did not need to worry about whether some defect in the process by which the note was issued would permit the bank to refuse to honor it." *Id.*

The original formal requirements to qualify as a negotiable instrument were strict. In a widely quoted 1846 case, Judge Gibson described a negotiable instrument as a "courier without luggage," meaning that it must be "framed in the fewest possible words, and those importing the most certain and precise contract," and free from any extraneous promises or conditions beyond the payment of a sum certain in money to a payee or to bearer at a determinable future time. *Overton v. Tyler*, 3 Pa. 346, 347 (1846).

Over time, the requirements for negotiability have been relaxed. Professor Whitman explains that this change was in large part the result of changes in the focus of bank lending as federally issued currency replaced the use of private bank notes:

> When bank notes were used as currency, banks were the makers of notes and consumers were the holders. In consumer lending transactions, these roles were reversed: consumers were the makers, and banks the holders of the notes. This gave banks an incentive to use their political power to broaden the definition of negotiability and increase their rights as holders.

Whitman, *supra*, at 66. Thus, over the course of the last 150 years, the scope of negotiability has broadened. The uniform negotiable instruments act, and

later its replacement, article 3 of the UCC, gradually increased the types of extraneous promises and conditions that a note could contain and still be negotiable. But even if the "courier without luggage" metaphor no longer works, an instrument must still meet specific formal requirements to qualify as negotiable.

Those requirements are now contained in article 3 of the UCC, which Washington adopted in 1965. Currently, article 3 provides that "negotiable instrument" means

> [a]n unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
>
> (1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
>
> (2) Is payable on demand or at a definite time; and
>
> (3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor, (iv) a term that specifies the law that governs the promise or order, or (v) an undertaking to resolve in a specified forum a dispute concerning the promise or order.

RCW 62A.3-104(a).

The UCC defines "holder" as follows:

9

"Holder" with respect to a negotiable instrument, means:

(A) The person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession.

RCW 62A.1-201(b)(21).[4]

And, critical to this case, article 3 makes clear that the holder of a negotiable instrument is the person entitled to enforce (PETE) it:

"Person entitled to enforce" an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to RCW 62A.3-309 or 62A.3-418(d).

RCW 62A.3-301.[5]

The UCC's definition of "holder" points to two other concepts important to understanding negotiable notes: negotiation and indorsement. "Negotiation" refers to the process of transferring rights in the instrument: it means "a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder." RCW 62A.3-201. "'Indorsement' means a signature . . . that . . .

---

[4] The UCC defines "holder" in the general definitions section of article 1. But, as seen, it defines holder "with respect to a negotiable instrument." Article 3 governs negotiable instruments, and the UCC contains no other definition of "holder." Thus, at times this opinion will refer to an "article 3 holder," meaning the holder of a negotiable instrument governed by article 3.

[5] As used in article 3, "'instrument' means negotiable instrument." RCW 62A.3-104(b). Thus, this PETE statute refers only to negotiable instruments.

is made on an instrument for the purpose of . . . negotiating the instrument." RCW 62A.3-204. "An indorsement can be a special indorsement (i.e., one that identifies a person to whom it makes the instrument payable) or a 'blank indorsement' (i.e., one that does not identify such an individual)." *21st Mortg. Corp. v. Nicholls*, 25 Wn. App. 2d 795, 805, 525 P.3d 962 (2023) (citing RCW 62A.3-205(a)-(b)).

"When indorsed in blank, an instrument becomes payable to the bearer and may be negotiated by transfer of possession alone until specially indorsed." RCW 62A.3-205(b). (Thus, another term for an instrument indorsed in blank or to bearer is "bearer paper.") If it is specially indorsed, "negotiation requires transfer of possession of the instrument and its indorsement by the holder." RCW 62A.3-201(b).

By its terms, article 3 applies only to negotiable instruments. There is no similar uniform body of law governing issues related to debt instruments that are not negotiable.[6] Instead, sources other than article 3 apply, including article 9 of the UCC and the common law of contracts.

---

[6] "A nonnegotiable instrument can be defined roughly as a writing containing a promise or order to pay money which fails to meet other formal requisites of a negotiable instrument but which resembles a negotiable instrument in form and which, by its nature, is such that the original parties could reasonably contemplate its transfer." William F. Willier, *Nonnegotiable Instruments*, 11 SYRACUSE L. REV. 13 (1959); *see* RCW 62A.9A-102(47) (for purposes of article 9, an "instrument" is "a negotiable instrument *or* any other writing that evidences a right to the payment

That means that the rules that apply to negotiable instruments do not necessarily apply to nonnegotiable instruments. We next consider what this all means in the specific context of mortgage notes.

III.     Transferring rights in mortgage notes

Under the UCC, there are two sets of rights in a mortgage note: ownership rights and enforcement rights. *Brown*, 184 Wn.2d at 524. Determining who holds each set of rights is critical, because only the person entitled to enforce the note—the PETE—can foreclose on the deed of trust.

> *A. Article 9 controls the transfer of ownership rights in notes regardless of negotiability*

In a typical transaction, when a borrower issues a note to a payee, "the note is initially owned by that payee." UCC REPORT at 8.[7] At that point, the payee is both the owner of the note and the person entitled to enforce the note. *Brown*, 184 Wn.2d at 527-28. In the context of mortgage notes, the lender is the original payee.

---

of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment" (emphasis added)).

[7] PERMANENT ED. BD. FOR UCC APPLICATION OF THE UNIFORM COMMERCIAL CODE TO SELECTED ISSUES RELATING TO MORTGAGE NOTES (2011) (UCC REPORT), https://www.ali.org/sites/default/files/2024-09/PEB-Nov-2011.pdf [https://perma.cc/S8L2-8ZLK].

But lenders often sell mortgage notes on the secondary market. *Id.* at 528. If a lender seeks to sell the note outright, article 9 of the UCC governs that transaction. *Id.*; RCW 62A.9A-109(a)(3) (article 9 "applies to . . . [a] sale of . . . promissory notes"). Article 9 determines whether a successful transfer of ownership rights has occurred. *Brown*, 184 Wn.2d at 528. The owner's rights include the "right to the economic benefits of the note, such as monthly mortgage payments and foreclosure proceeds." *Id.* at 524.

A purchaser of a mortgage note "gains 'outright ownership' of a note when the three conditions in RCW 62A.9A-203(b) are satisfied." *Id.* at 528 (citing UCC REPORT at 10). Relevant here, the seller "must either authenticate a 'security agreement' that describes the note *or* deliver possession of the note to the purchaser." *Id.* at 528-29 (footnote omitted) (quoting RCW 62A.9-203(b)(3)(A)-(B)). In this context, "authenticating a security agreement" simply means signing a written purchase-and-sale agreement or assignment. *Id.* at 529 & n.8; Whitman, *supra*, at 91. That means the owner of a mortgage note does not necessarily possess the note. Instead, they might own the note pursuant to a written assignment, without possession of the note.

### B. *Article 3 governs the transfer of enforcement rights in negotiable notes*

"If the mortgage note is a negotiable instrument, article 3 of the UCC provides a largely complete set of rules governing the obligations of parties on the note, including how to determine who may enforce those obligations and, thus, to whom those obligations are owed." UCC REPORT at 4 (footnote omitted).

These rules rely heavily on properly determining the PETE. *Brown*, 184 Wn.2d at 526. First, the borrower's obligation on the note is to pay the amount owed to the PETE. *Id.* (quoting RCW 62A.3-412). The borrower's obligation is discharged "*only* when the borrower pays the PETE." *Id*. at 527 (citing RCW 62A.3-602(a)). "After discharging its obligations to the PETE, the borrower cannot thereafter be held liable on the note by another party, such as the note owner." *Id*. (citing RCW 62A.3-602(a)). The PETE also has the right to negotiate with the borrower and modify the note. *Id.* at 526 (citing RCW 62A.3-604(a)). The PETE's possession of a negotiable note provides the borrower "'with a relatively simple way of determining to whom his or her obligation is owed and, thus, whom to pay in order to be discharged.'" *Id*. at 527 (quoting UCC REPORT at 8).

Unlike transfer of ownership under article 9, which can be accomplished by transfer of possession or by written assignment, under article

3, "the right to enforce a negotiable note can be transferred *only* by delivery of possession of the note itself." Whitman, *supra*, at 85 (emphasis omitted); RCW 62A.3-301.

Reading articles 3 and 9 together shows that the sale of a negotiable note may result in the bifurcation of ownership rights from enforcement rights. In other words, the owner and the PETE might be different people, depending on who possesses the note. *Brown*, 184 Wn.2d at 524-25 (a person may be a PETE "'even though the person is not the owner of the instrument or is in wrongful possession of the instrument'" (emphasis omitted) (quoting RCW 62A.3-301)). To give a simple example, imagine a lender sells a mortgage note to Fannie Mae. The lender retains possession of the note and acts as the note servicer. The lender is now the holder of the note, while Fannie Mae is the owner. As holder, the lender collects payments, negotiates with the borrower, and, if the borrower defaults, initiates foreclosure if directed to do so by the owner. As note owner, Fannie Mae is entitled to the proceeds of borrowers' monthly payments and the proceeds of any foreclosure. *Id.* at 520-24.

### C. The UCC does not explicitly address the transfer of enforcement rights in nonnegotiable notes

To reiterate, when a note is negotiable, it is relatively easy to determine who has the right to enforce and thus who has the right to foreclose. One simply looks to article 3's PETE statute. The "holder" of a negotiable instrument is always a PETE. RCW 62A.3-301.

But if a note is not negotiable, then article 3's rules about determining the PETE do not apply. UCC REPORT at 4 n.13. Instead, "[l]aw other than Article 3, including contract law, governs this determination for non-negotiable mortgage notes." *Id.* at 4 n.14.

Defendants RRA and RTR argue that the governing law is the common law of contracts. And they argue that under that law, the person in possession of a nonnegotiable instrument indorsed in blank is always the person entitled to enforce the instrument—just like the holder of a negotiable note governed by article 3. Br. of Defs. at 35.

Defendants are wrong. No Washington case resolves whether ownership and enforcement rights in a nonnegotiable note can be held by different parties, as they can with negotiable notes, or whether possession of a nonnegotiable note indorsed in blank necessarily establishes the right to enforce, as it does with negotiable notes. In fact, according to authorities that

16

defendants themselves cite, the majority common law view is that while enforcement rights in blank-indorsed nonnegotiable notes can be transferred by delivery and indorsement of the note, those rights can *also* be transferred by written assignment *without* delivery. Whitman, *supra*, at 97-98 & n.146 (collecting cases). In other words, under common law, the person in possession of a nonnegotiable note indorsed in blank may not be the PETE.

This issue will be discussed in greater detail below. For now, the salient points are (1) an instrument is not negotiable unless it meets the formal, statutory requirements for negotiability, which include an unconditional promise or order to pay a fixed amount of money, (2) under article 3, the holder of a negotiable note is, by definition, entitled to enforce the note and thus to foreclose on the deed of trust, and (3) under common law contract principles, the person in possession of a nonnegotiable note indorsed in blank is not necessarily entitled to enforce the note.

### D. Facts and procedural history

With this background in mind, we turn to the facts of this case. In 2005, plaintiff Marquez Vargas financed the purchase of his home using an "80/20 mortgage." Clerk's Papers (CP) Doc. 67, at 3-4 (order). In an 80/20 mortgage, the borrower finances 80 percent of the purchase price using a traditional mortgage and uses a subordinate HELOC to finance the remaining 20 percent.

*Id*. Marquez Vargas obtained both the traditional mortgage and the subordinate HELOC from lender Countrywide Home Loans Inc. *Id.* (The traditional mortgage is not at issue here.)

To obtain the line of credit, Marquez Vargas signed a "Home Equity Credit Line Agreement and Disclosure Statement" (HELOC agreement or note) on December 12, 2005. The HELOC agreement is indorsed in blank by Countrywide's managing director. CP Doc. 42-1, at 15-24. Marquez Vargas secured the HELOC agreement with a deed of trust to the home. CP Doc. 27-2, at 31-35.

The HELOC agreement's own language says that the agreement was a line of credit: it imposed a credit limit of $59,900 and the lender agreed to "lend money to [Marquez Vargas] from time to time" upon Marquez Vargas' "request for loans." CP Doc. 42-1, at 15, 18. The HELOC agreement provided for an initial 60-month draw period during which Marquez Vargas must make monthly minimum payments that would not reduce any outstanding principal balance. *Id.* at 15. At the expiration of the draw period, Marquez Vargas would "no longer be able to obtain loans" and the principal balance would become fixed. *Id.* A 180-month repayment period immediately followed, during which Marquez Vargas had to make monthly payments toward principal and interest. *Id.*

The HELOC agreement does not state that Marquez Vargas requested or received any loans. A separate document entitled "Home Equity Line of Credit Initial Draw Acknowledgment" stated that Marquez Vargas requested an initial draw of $59,900 from his line of credit at the time of closing. CP Doc. 27-5, at 110.

Marquez Vargas defaulted on this HELOC agreement in 2011 and failed to make any payments since then. CP Doc. 67, at 7. The principal balance was $59,761.05 at the time of his default. *Id.*

The note and deed of trust were sold several times. Defendant RRA purchased the note and deed of trust in 2016. CP Doc. 67.

In April 2022, loan servicer and defendant RTR executed a declaration on behalf of RRA. It declared under penalty of perjury that RRA was both the beneficiary of Marquez Vargas' deed of trust and the "holder" in possession of Marquez Vargas' HELOC agreement. CP Doc. 27-6.

In summer 2022, the trustee, defendant NST, served Marquez Vargas with a notice of default and a notice of trustee's sale. CP Doc. 42, at 12; CP Doc. No. 27-7, at 2. In October 2022, Marquez Vargas filed the instant lawsuit against defendants RRA, RTR, and NST in federal district court. He sought to quiet title to his property and alleged violations of the FDCPA, the WCAA,

and the CPA.[8] CP Doc. 67, at 8. The parties agreed to enjoin the trustee's sale during the pendency of this action. CP Doc. 67.

Marquez Vargas also moved to certify certain questions to this court. Defendants opposed this motion, *id.* at 9, and filed their own motion to dismiss. CP Doc. 27.

The district court granted defendants' motion to dismiss in part. It dismissed Marquez Vargas' quiet title claims and some of the FDCPA, WCAA, and CPA claims. CP Doc. 67. It deferred ruling on the remaining claims. And it granted Marquez Vargas' motion to certify in part to answer two questions necessary to decide those remaining claims. The federal court asks us these two questions:

(1) Whether a typical HELOC agreement[1] that has a closed draw period and specified maturity date is a negotiable instrument under Article 3 of Washington's Uniform Commercial Code? If the Court answers this question in the affirmative, it need not address the remaining question. Alternatively, the Court may choose to answer only the latter question.

(2) Whether an alleged beneficiary under the Deed of Trust Act satisfies the requirement to show that it is "the holder of any promissory note or other obligation secured by the deed of trust," [RCW] 61.24.030(7)(a), by executing a declaration under

---

[8] Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692e, e(2), (5), (10), 1692d(4), 1692f, f(l), (6); Washington's Collection Agency Act (WCAA), RCW §§ 19.16.110, .250(15), (16), (21), (23), .260(1)(a); and Washington's Consumer Protection Act (CPA), ch. 19.86 RCW.

penalty of perjury attesting that it is the holder of a HELOC agreement?

_____

[1] A typical HELOC agreement provides a credit limit applicable during the draw period, during which the borrower is responsible for monthly interest-only payments, and a repayment period, during which the borrower is responsible for monthly payments including principal and interest.

Doc. 78, at 2 (Ord. Certifying Questions to Wash. Sup. Ct.). We accepted review.[9]

## ANALYSIS

I.    A HELOC agreement, as defined in the certified question, is not a negotiable instrument because it is not an unconditional promise to pay a fixed amount of money

The federal court's first question is whether a HELOC agreement with certain characteristics constitutes a negotiable instrument. Those characteristics are the agreement provides a credit limit applicable to the "draw period, during which the borrower" must make "monthly interest-only payments"; the agreement has a "repayment period, during which the borrower" must make "monthly payments including principal and interest";

_____

[9] Northwest Consumer Law Center filed an amicus brief in support of plaintiff, which defendants answered.

21

the agreement has a specified maturity date; and the draw period has "closed." *Id.* at 2 n.1. We hold that such an agreement is not a negotiable instrument.

As discussed, article 3 of the UCC defines "negotiable instrument." One of the requirements for a negotiable instrument is that it contain "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." RCW 62A.3-104(a). At issue here is whether a HELOC agreement as defined meets this first requirement. We conclude it does not.

A traditional mortgage note is a promise to pay the fixed amount of principal received by the borrower as a loan. But a HELOC agreement as defined is *not* a promise to pay a fixed amount of money. "Rather, it is a promise to repay draws that may be taken from time to time against a credit limit." *Demakis v. SunTrust Bank*, 312 So. 3d 1015, 1016 (Fla. Dist. Ct. App. 2021) (citing *Third Fed. Sav. & Loan Ass'n v. Koulouvaris*, 247 So. 3d 652, 653-55 (Fla. Dist. Ct. App. 2018)). The amount of principal due is "based on a contingency—whether the borrower draws on the credit line." *SMS Fin. 30, LLC v. Frederick D. Harris, MD, Inc.*, 2018-Ohio-2064, 112 N.E.3d 395, ¶17. "[I]f the borrower never draws on the line of credit, nothing is owed." *Id.* And if the borrower does draw on the line of credit, one must look beyond the agreement itself "in order to ascertain the principal owed." *Id.* The HELOC

agreement at issue in this case does not contain an unconditional promise to pay a fixed amount of money; instead, it provides a credit limit and conditions disbursal of any loans upon the borrower's requests. CP Doc. 42-1, at 15, 18. And to discern the amount of principal that was in fact disbursed as a loan, one must look beyond the face of the HELOC agreement to a separate document, the "draw acknowledgment." CP Doc. 27-5, at 110. Thus, it is not a negotiable instrument.

The majority of jurisdictions to consider the issue have come to the same conclusion: credit line agreements, including HELOC agreements, are not negotiable instruments because they do not contain an unconditional promise to pay a fixed amount of money and instead require reference to separate documents to determine the principal amount borrowed.[10]

---

[10] *See, e.g.*, *Am. First Fed., Inc. v. Gordon*, 2015 WL 3798210, at \*9 (Conn. Super. Ct. May 26, 2015) ("The authorities generally agree that lines of credit which allow a borrower to draw sums up to a maximum amount are not negotiable instruments because they do not comply with the provision of the Uniform Commercial Code requiring that a negotiable instrument contain an unconditional promise to pay a 'sum certain' or 'fixed amount of money.'"), *aff'd*, 173 Conn. App. 573, 164 A.3d 776 (2017); *Yin v. Soc'y Nat'l Bank Ind.*, 665 N.E. 2d 58, 63 (Ind. Ct. App. 1996) (line of credit agreement not negotiable because "in order to ascertain the principal owed, one must look beyond the agreement itself"); *Heritage Bank v. Bruha*, 283 Neb. 263, 270, 812 N.W.2d 260 (2012) ("If reference to a separate instrument or extrinsic facts is needed to ascertain the principal due, the sum is not certain or fixed." (internal quotation marks omitted)); *OneWest Bank, NA v. FMCDH Realty, Inc.*, 165 A.D.3d 128, 134, 83 N.Y.S.3d 612 (2018); *Demakis*, 312 So. 3d 1015; *Koulouvaris*, 247 So. 3d at 653 (no fixed amount where "[n]othing on the face of the HELOC note indicates how much the Koulouvarises actually borrowed"); *SMS Fin.*, 112 N.E.3d at 400; *PNC Bank, Nat'l Ass'n v. Unknown*

Defendants argue that even if a HELOC agreement lacks a fixed amount due on its face at the time it is executed, we should consider it negotiable once the draw period has closed and the principal becomes fixed. Br. of Defs. at 58. In support of this argument, defendants rely primarily on *Wishengrad v. Carrington Mortgage Services*, 139 Nev. 116, 529 P.3d 880 (2023). In *Wishengrad*, the homeowners defaulted on payments under a HELOC agreement. The court discussed whether a HELOC agreement was a negotiable instrument that could be enforced under Nevada's UCC.

The homeowners argued that the HELOC agreement was not a negotiable instrument because it was a revolving line of credit rather than an unconditional promise to pay a fixed amount of money. *Id.* at 120. The Nevada

---

*Successor Trs. of Robert C. Keck Revocable Living Tr.*, 2020 OK CIV APP 60, ¶24, 479 P.3d 238, 244, *overruled on other grounds by MTGLQ Inv'rs, LP v. Witherspoon*, 2023 OK 62, 532 P.3d 21; *U.S. Bank Tr. Nat'l Ass'n v. Richardson*, 2022-Ohio-4753, 203 N.E. 3d 1290, ¶21; *U.S. Bank Nat'l Ass'n v. Grob*, 343 So. 3d 114, 116 (Fla. Dist. Ct. App. 2022); *CadleRock Joint Venture LP v. Esperanza Architecture & Consulting, Inc.*, 2021 COA 119, ¶17, 500 P.3d 402, 405; *Bennett v. CIT Bank, NA*, 544 F. Supp. 3d 1225, 1231 (N.D. Ala. 2021); *Chuchian v. Situs Invs., LLC*, 219 So. 3d 992, 993 (Fla. Dist. Ct. App. 2017); *Cadle Co. v. Allshouse*, 2007 WL 5472749 (Pa. Ct. Com. Pl. 2006), *aff'd*, 959 A.2d 455 (Pa. Super. Ct. 2008) (mem.); *FFP Mktg. Co. v. Long Lane Master Tr. IV*, 169 S.W.3d 402, 408 (Tex. App. 2005); *Diversified Fin. Sys., Inc. v. Hill, Heard, O'Neal, Gilstrap & Goetz, PC*, 99 S.W.3d 349, 357 (Tex. App. 2003); *Remington Invs., Inc. v. Hamedani*, 55 Cal. App. 4th 1033, 1042, 64 Cal. Rptr. 2d 376 (1997); *Resol. Tr. Corp. v. Oaks Apts. Joint Venture*, 966 F.2d 995, 1001-02 (5th Cir. 1992); *Cadle Co. v. Richardson*, 597 So. 2d 1052, 1055 (La. Ct. App. 1992); *In re Hipp, Inc.*, 71 B.R. 643, 649 (Bankr. N.D. Tex. 1987); *Farmers Prod. Credit Ass'n v. Arena*, 145 Vt. 20, 22-23, 481 A.2d 1064 (1984).

Supreme Court disagreed. The court acknowledged that on the face of the HELOC agreement, "the ultimate sum that the Wishengrads would borrow during the draw period was unknown." *Id.* But that court relied on the fact that the amount of principal due would become fixed at some later point: "the amount that the Wishengrads withdrew under the agreement, which would become due upon maturity, would indeed be certain and fixed upon the close of the draw period." *Id.* at 122. The court concluded that "a HELOC with a closed draw period and specified maturity date . . . is an unconditional promise to pay a fixed amount of money." *Id.* at 120 (citing NEV. REV. STAT. 104.3104(1)).

We decline to follow *Wishengrad* because it conflicts with clear Washington law holding that "[n]egotiability is determined from the face, the four corners, of the instrument *at the time it is issued* without reference to extrinsic facts." *Bucci v. Nw. Tr. Servs., Inc.*, 197 Wn. App. 318, 329, 387 P.3d 1139 (2016) (emphasis added) (citing 5A RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 3-104:13, at 115 (3d ed. 1994) (citing *Holsonback v. First State Bank of Albertville*, 394 So. 2d 381 (Ala. Civ. App. 1980))); *21st Mortg. Corp.*, 25 Wn. App. 2d at 804-05. Negotiability is "'fixed at the time of execution'" and "'turns entirely upon the form of the instrument and the terms in which it is expressed.'" *Mar v.*

*Wash. Mut. Sav. Bank*, 64 Wn.2d 793, 794, 394 P.2d 367 (1964) (quoting 11 AM. JUR. 2D, *Bills and Notes* § 2 (1963)). A nonnegotiable instrument cannot transform into a negotiable one: "an instrument is negotiable for all purposes or non-negotiable for all purposes." *Bank of Cal., NA v. Nat'l City Co.*, 141 Wash. 243, 244, 251 P. 561 (1926). While the face of the agreement need not state the "current balance" due, it must state the actual amount of principal initially borrowed. *Bucci*, 197 Wn. App. at 330-31 (promissory note that stated a promise to repay a $1.53 million refinance loan was negotiable, even though note also stated conditions under which principal might increase due to negative amortization). Under Washington law, the fact that a draw period has now closed and the principal amount due is now fixed is not relevant to determining whether the note was negotiable at the time it was issued.

*Wishengrad*'s reasoning does not persuade us to discard our long-standing precedent. That opinion does not address any of the numerous decisions (including those cited above at footnote 8) that have analyzed line of credit agreements like HELOCs and concluded that they are not negotiable instruments. Instead, the *Wishengrad* court relied solely on language from a case that did not discuss the concept of negotiability at all. 139 Nev. at 119 (citing *Webster Bank NA v. Mutka*, 250 Ariz. 498, ¶9, 481 P.3d 1173 (Ct. App. 2021)). The issue in *Mutka* was what statute of limitations applied to missed

payments under a HELOC agreement. *Id. Mutka* had nothing to do with whether a HELOC agreement meets the "unconditional promise to pay a fixed amount of money" requirement for negotiability.

Defendants cite no other authority supporting their argument that a HELOC agreement is a negotiable instrument. *See* Br. of Defs. at 59-61. We find no persuasive authority that analyzes the statutory requirements for negotiability and comes to that conclusion, either.[11]

We therefore hold, in line with the majority viewpoint, that a HELOC agreement as defined in the certified question is not a negotiable instrument. Under Washington law, determining negotiability requires examining the specific terms of the instrument at the time it was issued. The fact that an agreement provides that the principal will become fixed at a future date fails to satisfy the "fixed amount of money" requirement.

II. An alleged beneficiary under the DTA cannot satisfy RCW 61.24.030(7)(a) by declaring that it is the holder of a nonnegotiable instrument

The second question the federal court asked us is whether an alleged beneficiary under the DTA satisfies the requirement to show that it is "the

---

[11] *E.g.*, *Tenn. State Bank v. Mashek*, 616 S.W.3d 777, 794 (Tenn. Ct. App. 2020) (referring to a HELOC agreement as a negotiable promissory note without analyzing the requirements for negotiability).

holder of any promissory note or other obligation secured by the deed of trust," RCW 61.24.030(7)(a), by attesting that it is the "holder" of such a nonnegotiable HELOC agreement.

As discussed, the DTA does not define "holder," but article 3 of the UCC does. Marquez Vargas argues that our prior case law "adopted" the UCC's definition of "holder" and thereby limited the term's meaning to the person in possession of a negotiable instrument who is entitled to enforce it. Appellant's Reply Br. at 5. Therefore, since a HELOC agreement is not a negotiable instrument, Marquez Vargas argues that defendants cannot comply with RCW 61.24.030(7)(a). Because compliance with that statute is a prerequisite to nonjudicial foreclosure, Marquez Vargas argues that the remedy of nonjudicial foreclosure is unavailable to defendants in this case.

Defendants disagree. They point out that the DTA is silent as to negotiability and that if the legislature had meant to restrict the nonjudicial foreclosure to negotiable instruments, it would have said so. Br. of Defs. at 23. They argue that the legislature's purpose in enacting RCW 61.24.030(7)(a) is still served if we interpret "holder" as encompassing nonnegotiable instruments. Defendants also argue that the DTA uses the term "holder" in other contexts where there would be no reason to believe the

legislature intended to exclude nonnegotiable instruments. Br. in Answer to Amicus Br. of Nw. Consumer L. Ctr. (Answer to Amicus) at 2-3.

Defendants make some compelling points. But we agree with Marquez Vargas. The plain language of the statute in context, combined with our prior interpretations of the statute's language and its legislative intent, compel us to conclude that the legislature intended to restrict the term "holder" in this context to the holder of a negotiable instrument.

### A. Interpreting "holder" in RCW 61.24.030(7)(a)

This question presents an issue of statutory interpretation. When interpreting a statute, our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). To determine plain meaning, we consider "statutory context, related statutes, and the entire statutory scheme." *Swinomish Indian Tribal Cmty. v. Dep't of Ecology*, 178 Wn.2d 571, 582, 311 P.3d 6 (2013).

Our task in this case is made easier by the fact that this court has already determined that by enacting the proof-of-beneficiary requirement in RCW

61.24.030(7)(a), the legislature intended to "ensure the party with the *authority to enforce and modify the note* is the party engaging in mediation and foreclosure." *Brown*, 184 Wn.2d at 543. Further, we have already determined that the definition of "holder" from article 3 should "guide[]" our interpretation of the term "holder" in the DTA's definition of "beneficiary." *Bain*, 175 Wn.2d at 104.

We give our prior decisions interpreting a statute great weight. In fact, "[o]nce the Court has determined the meaning of a statute, that is what the statute has meant since its enactment." *In re Pers. Restraint of Johnson*, 131 Wn.2d 558, 568, 933 P.2d 1019 (1997) (citing *In re Pers. Restraint of Vandervlugt*, 120 Wn.2d 427, 436, 842 P.2d 950 (1992); *In re Pers. Restraint of Moore*, 116 Wn.2d 30, 37, 803 P.2d 300 (1991)).[12] We therefore begin by

---

[12] We have historically applied a strict construction rule when interpreting the DTA: "lenders must strictly comply with the statutes and courts must strictly construe the statutes in the borrower's favor" because the DTA "dispenses with many protections commonly enjoyed by borrowers under judicial foreclosures." *Albice v. Premier Mortg. Servs. of Wash., Inc.*, 174 Wn.2d 560, 567, 276 P.3d 1277 (2012) (citing *Udall v. T.D. Escrow Servs., Inc.*, 159 Wn.2d 903, 915-16, 154 P.3d 882 (2007); *Koegel v. Prudential Mut. Sav. Bank*, 51 Wn. App. 108, 111-12, 752 P.2d 385 (1988)). The conclusion that the DTA provides less protection to borrowers than judicial foreclosure may be an outdated one. Currently, the DTA provides for foreclosure mediation, a program that is available only to borrowers facing nonjudicial foreclosure. Answer to Amicus at 12 (citing RCW 61.24.163(1), .165). Defendants provide statistics suggesting that foreclosure mediation helps borrowers retain their homes. *Id.* at 11 (citing WASH. DEPT. OF COM., QUARTERLY PERFORMANCE REPORT, FY25 QUARTER 3 (Jan.-Mar. 2025), https://deptofcommerce.box.com/s/z9sov8mwh6lelqormtdwvhma08cymbdo). They also cite studies suggesting that the default rate in judicial foreclosure cases is

considering our prior interpretations of the plain language of RCW 61.24.005(2) and RCW 61.24.030(7)(a).

> **B. Our case law makes clear that a beneficiary, and thus a holder, must be the person entitled to enforce a mortgage note**

> **i. *Bain v. Metropolitan Mortgage Group, Inc.* (2012)**

We first considered the meaning of the DTA's terms "beneficiary" and "holder" in *Bain*, 175 Wn.2d 83. There, the plaintiff homeowners' deeds of trust named Mortgage Electronic Registration System Inc. (MERS) as beneficiary and "nominee" for the lender. When plaintiffs defaulted, MERS, purporting to act as beneficiary, appointed successor trustees who initiated foreclosure proceedings. *Id.* at 89.

But MERS conceded that it did not "hold" any promissory notes. Resp. Br. of Def. MERS at 34, *Bain v. Metro. Mortg. Grp., Inc.*, No. 86206-1 (Wash. Ct. App. (2011)). Plaintiffs argued that MERS therefore could not be a beneficiary within the meaning of RCW 61.24.005(2), which defines a beneficiary as the holder of the note or obligation secured by the deed of trust.

---

high, at least in other states. *Id.* at 15. There may be reason, then, for the legislature or this court to revisit our prior conclusions about the borrower-friendliness of the DTA at some point. However, it is not necessary to do so in this case. Instead, we adhere to our prior interpretation of the legislative intent behind RCW 61.24.030(7)(a) and conclude that interpreting "holder" as limited to the holder of a negotiable instrument comports best with that intent.

Plaintiffs thus argued that MERS' actions in appointing successor trustees were unlawful.

MERS responded that parties were free to contract around the DTA's definition of beneficiary. *Bain*, 175 Wn.2d at 99.

We rejected that argument. We reemphasized the core principle that the note and the mortgage cannot be split and that only the person entitled to enforce a note may foreclose on a deed of trust. *Id.* at 96-97. We explained that the legislature's use of the term "beneficiary" in other parts of the DTA showed legislative intent that a beneficiary must be the person entitled to enforce the mortgage note. For example, in the Foreclosure Fairness Act of 2011, which amended the DTA, the legislature stated that it "'intends to . . . [c]reate a framework *for homeowners and beneficiaries to communicate with each other* to reach a resolution and avoid foreclosure whenever possible.'" *Id.* at 103 (quoting LAWS OF 2011, ch. 58, § 1). This provision wouldn't make sense if "beneficiary" could include an entity like MERS that did not have authority to enforce, modify, or discharge the note, because such an entity would be unable to negotiate a resolution with the borrower. *Id.*

*Bain* supported this conclusion by applying the principle that we consider related statutes when construing statutory terms. *Id.* (citing *Campbell & Gwinn*, 146 Wn.2d at 11-12). We determined that the UCC is a related

statute that is relevant to interpreting the DTA. We quoted two provisions from the UCC: the definition of "holder" and article 3's definition of "person entitled to enforce." *Id.* at 104 (quoting former RCW 62A.1-201(20) (2001);[13] RCW 62A.3-301). We stated that "our interpretation of the deed of trust act should be guided by these UCC definitions, and thus a beneficiary must either actually possess the promissory note or be the payee." *Id.*

*Bain* shows that in requiring a DTA beneficiary to be a "holder" of the note, the legislature intended at minimum that the beneficiary be a PETE with authority to enforce the note and foreclose on the deed of trust. *See id.*

Plaintiff argues that *Bain* went further than just saying that a beneficiary must have the authority to enforce the note. Plaintiff argues that *Bain* "adopted" the UCC definition of "holder" and "required actual possession of a negotiable instrument to proceed with foreclosure." *See* Pl.'s Opening Br. at 59-61; Appellant's Reply Br. at 5-6.

*Bain* did rely on the UCC's definition of "holder" (which refers to the holder of a negotiable instrument) and article 3's definition of "person entitled to enforce" to figure out what the DTA meant when it used the term "holder."

---

[13] As discussed above, the definition of "holder" is currently codified at RCW 62A.1-201(b)(21)(A). The definition that *Bain* considered is the same in relevant respects as the current definition.

But negotiability was not an issue in *Bain*, so there was little reason for the court to consider whether there would be a distinction in the way the DTA treated negotiable versus nonnegotiable notes.

Later decisions of the Court of Appeals and this court, however, do interpret the term "holder" as limited to the UCC definitions of "holder" and "person entitled to enforce." We summarize those decisions below. They show that our precedent does tell us to interpret the term "holder" as plaintiff suggests.

ii. *Lyons v. U.S. Bank National Association* (2014) and *Trujillo v. Northwest Trustee Services., Inc.* (2015)

In *Lyons v. U.S. Bank National Association*, the trustee relied on a beneficiary declaration from Wells Fargo Bank and initiated nonjudicial foreclosure. 181 Wn.2d 775, 336 P.3d 1142 (2014). The declaration was ambiguous about how Wells Fargo claimed it achieved beneficiary status; it stated:

> "Wells Fargo Bank, NA, . . . is the actual holder of the promissory note or other obligation evidencing the above-referenced loan *or* has requisite authority under RCW 62A.3-301 [article 3's PETE statute] to enforce said obligation."

*Id.* at 780 (emphasis added) (quoting court papers). Lyons sued the trustee under the CPA, arguing in part that the trustee failed to comply with former

RCW 61.24.030(7)(a) (2012) because the trustee relied on a deficient beneficiary declaration. *Id.* at 782.

We held that the beneficiary declaration was deficient: "On its face, it is ambiguous whether the declaration proves Wells Fargo is the holder *or* whether Wells Fargo is a nonholder in possession *or* person not in possession who is entitled to enforce the provision under RCW 62A.3-301." *Id.* at 791 (emphasis added). But "only a holder has the requisite authority to act as a beneficiary under *Bain.*" *Id*. Thus, we held that the beneficiary declaration did not comply with former RCW 61.24.030(7)(a) and reversed summary judgment on Lyons' CPA claim. *Id.* at 788-89.

By contrasting the term "holder" with the two other methods of attaining article 3 PETE status listed in RCW 62A.3-301, *Lyons* implies that "holder" carries the article 3 meaning as well.

We reaffirmed *Lyons* in *Trujillo v. Northwest Trustee Services, Inc.*, 183 Wn.2d 820, 355 P.3d 1100 (2015). There, the plaintiff homeowner sued the trustee for violating the DTA by relying on a beneficiary declaration identical to the one in *Lyons*. Applying *Lyons*, we held that the declaration was "ambiguous about whether Wells Fargo actually held the note when it initiated the foreclosure," and because the plaintiff alleged that the trustee relied on this ambiguous declaration to initiate foreclosure, she had alleged

facts sufficient to prove a violation of the DTA. *Id.* at 833-34 (citing *Lyons*, 181 Wn.2d at 790).

Thus, *Lyons* and *Trujillo* rely on *Bain* for the rule that a beneficiary must prove article 3 holder status to satisfy RCW 61.24.030(7)(a). Several Court of Appeals decisions do so, too. *E.g.*, *Bavand v. OneWest Bank, FSB*, 176 Wn. App. 475, 498-99, 309 P.3d 636 (2013), *abrogated in part on other grounds by Frias v. Asset Foreclosure Servs., Inc.*, 181 Wn.2d 412, 334 P.3d 529 (2014); *Blair v. Nw. Tr. Servs., Inc.*, 193 Wn. App. 18, 34-36, 372 P.3d 127 (2016).

But again, as in *Bain*, negotiability was not an issue in these cases, so the court did not explicitly consider the distinction between negotiable and nonnegotiable notes and why the legislature might want to distinguish between them.

### iii.  *Brown v. Department of Commerce* (2015)

In *Brown v. Department of Commerce*, however, we concluded that the legislature's "clear purpose" in enacting RCW 61.24.030(7)(a) was "to ensure the party with the *authority to enforce and modify the note* is the party engaging in mediation and foreclosure." 184 Wn.2d at 543. That conclusion about legislative intent decides the issue in this case.

In *Brown*, we first considered the distinction between a note's owner and its holder. There, a homeowner facing foreclosure sought to participate in the DTA's foreclosure mediation program, which required that "a beneficiary of a deed of trust must mediate with a residential borrower before the borrower's home may be foreclosed." 184 Wn.2d at 514 (citing RCW 61.24.163). But the mediation program contained an exemption for certain small banks. *Id.* (citing RCW 61.24.166).

Brown defaulted on her mortgage obligations, received a notice of default, and sought to participate in mediation. The Department of Commerce denied her request on the ground that the beneficiary of Brown's deed of trust fell within this small-bank exemption. The department was certainly correct if the small bank that was the holder of Brown's note was the beneficiary; but it was incorrect if the very big, nonexempt Freddie Mac, which owned the note, was the beneficiary. *Id.*

The department argued that the DTA's definition of "beneficiary" unambiguously showed that the beneficiary is the holder of the note. *Id.* at 533.

But two provisions of the DTA created ambiguity as to whether the beneficiary for purposes of the mediation provisions must be the holder or the owner. The mediation provisions required that once parties are referred to

mediation, the alleged beneficiary must provide proof that it is the "owner" of the note. RCW 61.24.163(5)(c). A copy of the declaration described in former RCW 61.24.030(7)(a) would provide sufficient proof of ownership. *Id.*

The declaration described in former RCW 61.24.030(7)(a), however, did not require the beneficiary to swear to ownership status; it required the beneficiary to swear to holder status. Former RCW 61.24.030(7)(a) provided that prior to initiating a trustee sale,

> the trustee shall have proof that the beneficiary is the *owner* of any promissory note or other obligation secured by the deed of trust. A declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the *actual holder* of the promissory note or other obligation secured by the deed of trust shall be sufficient proof as required under this subsection.

(Emphasis added.)

We explained that these provisions were ambiguous "in cases where the owner of the note is different from the holder of the note." *Brown*, 184 Wn.2d at 534. If the owner and holder are different entities, then former RCW 61.24.030(7)(a) makes no sense—an alleged beneficiary's declaration that it is the "actual holder" of the note would not prove that it was also the "owner" of the note. Likewise, if the owner and holder are different entities, an alleged beneficiary's declaration that it is the holder of the note would not satisfy RCW 61.24.163(5)(c), which required the alleged beneficiary in mediation to prove it is the owner of the note.

To reconcile this ambiguity and determine legislative intent, we looked to statutory context, case law, and legislative history. The mortgage note in *Brown* was negotiable, so article 3 concepts applied. *Id.* at 524. Given the article 3 PETE's role as the entity with the power to enforce, modify, and discharge a debt, *Brown* concluded that where ownership and enforcement rights in a negotiable note are split between two parties, the legislature intended the holder, who by definition has PETE status, to be the party participating in mediation and foreclosure—not the owner. *Id.* at 543.

We confirmed this interpretation by examining the legislative history behind former RCW 61.24.030(7)(a), which was adopted at the same time as the mediation provisions. That history showed that the legislature was concerned that few homeowners "'know who has *the authority to negotiate with them* due to loan repackaging.'" *Id*. (quoting S.B. REP. ON S.B. 5810, at 3-4, 61st Leg., Reg. Sess. (Wash. 2009) (S.B. 5810 Report)[14]). Legislators expressed the viewpoint that the foreclosing party "'should *have to present the paper* to prove they have *authority to foreclose.*'" *Id.* (quoting S.B. 5810 Report).

---

[14] http://lawfilesext.leg.wa.gov/biennium/2009-10/Pdf/Bill%20Reports/Senate/5810%20SBA%20FIHI%2009.pdf

We therefore concluded that in enacting RCW 61.24.030(7)(a), "[t]he legislature's clear purpose was to ensure the party with the *authority to enforce and modify the note* is the party engaging in mediation and foreclosure. As discussed above, the holder of the note, the PETE, is the person with the authority to enforce and modify the note." *Id.* We held that the small bank, not Freddie Mac, was the beneficiary of Brown's note. *Id.* at 544. That meant that Brown was not entitled to participate in the statutory foreclosure mediation program because the bank was small enough to be exempt from that process. *Id.*

> C. *The legislature's 2018 amendment to RCW 61.24.030(7)(a) shows it intended to adopt our prior interpretation of "holder" and confirms that its proof-of-beneficiary requirement is meant to ensure that the alleged beneficiary has authority to enforce the note*

In 2018, the legislature amended RCW 61.24.030(7)(a) to remove reference to the "owner" of the note. As quoted throughout this opinion, the statute now requires the alleged beneficiary to prove only that it is the "holder" of the note. LAWS OF 2018, ch. 306, § 1.

This amendment is important. We "presume the Legislature is familiar with past judicial interpretations of its enactments." *Glass v. Stahl Specialty Co.*, 97 Wn.2d 880, 887, 652 P.2d 948 (1982) (citing *Bixler v. Bowman*, 94 Wn.2d 146, 149, 614 P.2d 1290 (1980)). Thus, this "court's prior use or

interpretation of a term will be considered in ascertaining the meaning of a statute." *State v. Faust*, 93 Wn. App. 373, 378, 967 P.2d 1284 (1998) (citing *Gimlett v. Gimlett*, 95 Wn.2d 699, 702, 629 P.2d 450 (1981); *Miller v. Paul Revere Life Ins. Co.*, 81 Wn.2d 302, 308, 501 P.2d 1063 (1972)). When the legislature amends a statute after this court's interpretation of that statute, we presume that the new legislation is consistent with our prior interpretation unless we find "clear legislative intent to abrogate" our binding interpretation. *Antio, LLC v. Dep't of Revenue*, 3 Wn.3d 882, 890, 557 P.3d 672 (2024) (citing *Friends of Snoqualmie Valley v. King County Boundary Rev. Bd.*, 118 Wn.2d 488, 496, 825 P.2d 300 (1992); *In re Marriage of Williams*, 115 Wn.2d 202, 208, 796 P.2d 421 (1990)).

*Bain* held that by including the term "holder" in the "beneficiary" definition, the legislature wanted to ensure that the beneficiary of a deed of trust was the PETE, reaffirming the principle that the mortgage follows the note. *Brown* confirmed that in enacting the beneficiary declaration provision in RCW 61.24.030(7)(a), the legislature wanted to ensure that the borrower knows that the beneficiary is really the PETE. *Lyons* and *Trujillo* went further, interpreting *Bain* as holding that the beneficiary must be the article 3 holder of the note—even though there are additional ways to achieve PETE status under article 3.

This was the context in which the legislature decided to retain the term "holder" unchanged when it deleted "owner" from RCW 61.24.030(7)(a). In making that decision, the legislature ensured that this court's interpretations of "holder," described above, were accurately reflected in its laws.[15]

The dissent argues that instead of showing that the legislature acquiesced in this court's prior interpretation of "holder," the 2018 amendment shows that the legislature rejected our interpretation.

The dissent is wrong. First, the dissent completely ignores the main change that the legislature made to the statute: it deleted the term "owner." As discussed above, this change brings the previously ambiguous statute in alignment with *Brown*'s analysis.

Next, the dissent focuses on a minor change made by the 2018 amendment: the legislature replaced "*the* promissory note" with "*any* promissory note" in the second sentence of the statute. LAWS OF 2018, ch. 306, § 1(7)(a) (emphasis added). The dissent asserts that this was an earthshaking change that showed which the statute's coverage was growing.

---

[15] *Bain*, *Lyons*, and *Trujillo* seemed to use the terms "owner" and "holder" interchangeably. This was likely because all of these cases were interpreting the prior version of RCW 61.24.030(7)(a), which required the beneficiary to establish that it was both the owner and the holder of the note, and before *Brown* clarified the distinction between the rights of an owner and the rights of a holder.

But that is incorrect: the change from "the" to "any" simply made that second sentence more clearly conform to the language of the first sentence, which already contained "any" rather than "the." Specifically, prior to the 2018 amendment, former RCW 61.24.030(7)(a) provided that prior to initiating a trustee sale,

> the trustee shall have proof that the beneficiary is the owner of *any* promissory note or other obligation secured by the deed of trust. A declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the actual holder of *the* promissory note or other obligation secured by the deed of trust shall be sufficient proof as required under this subsection.

Following this court's decision in *Brown*, which focused on the distinction between an owner and a holder of a negotiable promissory note, the legislature made the major change of deleting the term "owner" and replaced "actual holder" with "holder." That reflected *Brown*'s holding. But at the same time, the legislature changed the descriptor "the" in the first sentence to "any" to conform to its use of descriptors in the second sentence. As a result of those 2018 amendments, the current version of the statute provides:

> the trustee shall have proof that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust. A declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust shall be sufficient proof as required under this subsection.

43

The fact that the legislature changed the modifier from "the" to "any" in the second sentence to conform its language with a phrase that the statute *already contained* is not really evidence that the legislature intended to reject this court's prior, narrowing interpretations of the statute. We usually require much more evidence that the legislature intended to abrogate our prior case law. *Antio*, 3 Wn.3d at 890 ("A court must find clear legislative intent to abrogate a binding judicial decision.").

Indeed, the dissent agrees that our precedent "narrow[s] the reach of the statute" by limiting the meaning of "holder" to the holder of a negotiable instrument. Dissent at 12. The dissent seems to disagree with that precedent. It even goes so far as suggesting that *Bain* is no longer good law, stating that the 2018 amendments to subsection (7)(a) mean that "reliance on the UCC's definitions is unnecessary and erroneous." *Id.* at 15. In making this argument, the dissent goes further than any party did—no one has argued that *Bain*, or any other case relevant to this issue, should be overruled.

Some of the dissent's arguments may have been plausible interpretations prior to our decisions in *Bain*, *Lyons*, *Trujillo*, and *Brown*. But those cases all limited the scope of the DTA's term "holder." And the legislature acquiesced in that limitation when it amended the statute and retained the term "holder."

This legislative acquiescence explains why one of defendants' other arguments fails. Defendants argue that the term "holder" is used outside of the context of negotiable instruments. And they argue that the legislature's use of the term "holder" in another provision of the DTA "suggest[s] that its meaning should not be limited to the definition of a 'holder' of a negotiable instrument." Answer to Amicus at 2. Defendants point out that RCW 61.24.040, which relates to the required contents of a notice of trustee's sale, uses the term "holder" several times. For example, that statute requires the trustee to send notice to "the holder of any conveyances of any interest or estate in . . . the property" and the "last holder of record" of certain subordinate liens against the property under certain circumstances. RCW 61.24.040(1)(B)(iii)-(v).

To be sure, courts have used the term "holder" outside the context of negotiable instruments (although the decisions Defendants cite to show this all predate the adoption of the UCC). *See* Br. of Defs. at 28.[16] But defendants

---

[16] The dissent places great weight on a 1985 Court of Appeals case, *Rodgers v. Seattle-First Nat'l Bank*, 40 Wn. App. 127, 132, 697 P.2d 1009 (1985), for the conclusion that "someone can be a 'holder' of a nonnegotiable instrument." Dissent at 13-14. As cited above, we do not dispute that some courts have referred to the "holder" of a nonnegotiable note. But *Rodgers'* passing use of the term "holder" in reference to terms contained in a nonnegotiable note does not affect our analysis here for several reasons. *Rodgers* had nothing to do with the scope of the term "holder" as used in the DTA. Further, much of that decision's analysis is no longer good law because it relies on now-outdated versions of UCC article 9. Finally, of

do not explain how the uses of the term "holder" in RCW 61.24.040 suggest that its meaning should include "holders" of nonnegotiable instruments. RCW 61.24.040 existed in 2018, when the legislature amended RCW 61.24.030(7)(a) and affirmatively agreed with this court's interpretation of "holder." The legislature has kept the word "holder" in RCW 61.24.040; we thus presume that the legislature agrees that "holder" carries the meaning this court gave it in that statute, too.

> D. *Because the person in possession of a nonnegotiable note is not necessarily the PETE, an alleged beneficiary's declaration that it is the holder of a nonnegotiable note does not fulfill the legislature's intent to ensure that the borrower knows the alleged beneficiary has authority to foreclose*

Defendants agree that the purpose of RCW 61.24.030(7)(a) is to ensure that the party seeking to foreclose is the party with the authority to enforce the note. Br. of Defs. at 33-34. They argue that this concept is what the legislature intended to capture with the term "holder," but that the legislature did not intend to limit nonjudicial foreclosure to negotiable instruments. *Id.* at 34. Defendants contend that just like with negotiable notes, possession of a nonnegotiable note indorsed in blank is sufficient to establish that the possessor is the person entitled to enforce the note. *Id.* Thus, defendants argue

---

course, that Court of Appeals opinion is not controlling—instead, the controlling law on the meaning of the term "holder" includes the more recent precedent from this court, including *Bain*, *Lyons*, *Trujillo*, and *Brown*.

that reading "holder" to encompass a person in possession of a nonnegotiable note indorsed in blank would be consistent with legislative intent. *Id.* at 34, 18-19.[17]

But an alleged beneficiary's declaration that it is the "holder" in possession of a nonnegotiable note indorsed in blank does *not* necessarily inform the borrower that the beneficiary has authority to enforce the note.

As noted, "[l]aw other than Article 3, including contract law, governs" the determination of enforcement rights for nonnegotiable mortgage notes. UCC REPORT at 4 n.14. Defendants argue that the common law of contract applies and that under that law, possession of a nonnegotiable instrument indorsed in blank necessarily indicates the right to enforce the instrument. Br. of Defs. at 40.

Defendants are certainly correct that the majority common law view is that it is *possible* to transfer the right to enforce a nonnegotiable note "in exactly the same way as a negotiable note." Whitman, *supra*, at 97-98 &

---

[17] Defendants also argue that Washington courts have "applied the DTA to other equity lines of credit." Br. of Defs. at 43-45 (citing *OneWest Bank, FSB v. Erickson*, 185 Wn.2d 43, 73-74, 367 P.3d 1063 (2016); *Bert Kuty Revocable Living Tr. ex rel. Nakano v. Mullen*, 175 Wn. App. 292, 297, 305, 306 P.3d 994 (2013)). Neither case they cite is on point. First, *Erickson* dealt with a judicial foreclosure and specifically stated that the DTA did not apply. 185 Wn.2d at 74. Second, negotiability was not an issue in either of these cases.

nn.143, 144 (collecting cases). So, if a nonnegotiable note is indorsed in blank, it is possible to transfer the right to enforce it by physical delivery to a transferee. *See, e.g.*, *id.*; *Puget Sound State Bank v. Wash. Paving Co.*, 94 Wash. 504, 517, 162 P. 870 (1917) (nonnegotiable notes indorsed in blank are "capable of passing their title by delivery"); *see also* Br. of Defs. at 36-37 (collecting cases). Thus, possession of a nonnegotiable note indorsed in blank *may* indicate that the possessor has authority to enforce the note.

But there is ample authority—including authority cited by defendants—that possession of a nonnegotiable note indorsed in blank does not *necessarily* indicate that the possessor has authority to enforce the note. *See* Br. of Defs. at 36-37. Professor Whitman, on whose work defendants rely, states that while some decisions hold that possession is necessary for enforcement of a nonnegotiable note, "a substantial majority" of jurisdictions "recognize the validity of a transfer [of enforcement rights] by a separate document of assignment, *without* indorsement or delivery of the note itself." Whitman, *supra*, at 97-98 & n.146 (emphasis added) (collecting cases). *See also* Dale A. Whitman & Drew Milner, Symposium, *Foreclosing on Nothing: The Curious Problem of the Deed of Trust Foreclosure Without Entitlement To Enforce the Note*, 66 ARK. L. REV. 21, 31 & n.42 (2013) ("It is clear that, unlike a negotiable instrument, enforcement rights in a nonnegotiable note can

be transferred by a separate document of assignment." (citing *Margiewicz v. Terco Props. of Miami Beach, Inc.*, 441 So. 2d 1124, 1125 (Fla. Dist. Ct. App. 1983); *Bank of N.Y. v. Raftogianis*, 13 A.3d 435, 438 (N.J. Super. Ct. Ch. Div. 2010))).

That means that "possession is not a reliable indicium of the right to enforce nonnegotiable notes, as it is for negotiable notes." Whitman, *supra*, at 99; *accord* William F. Willier, *Nonnegotiable Instruments*, 11 SYRACUSE L. REV. 13, 14-15 (1959); *OneWest Bank, NA v. FMCDH Realty, Inc.*, 165 A.D.3d 128, 134, 83 N.Y.S.3d 612 (2018) (for purposes of summary judgment, plaintiff's possession of nonnegotiable note indorsed in blank was not sufficient to establish that plaintiff had the right to enforce).[18]

We find no Washington case that directly answers the question whether possession of a nonnegotiable instrument necessarily indicates the right to enforce. But given that the majority of jurisdictions applying the common law hold that delivery of possession is not necessary to transfer the right to enforce a nonnegotiable note, we decline to adopt defendants' contrary position. The result is that interpreting the DTA's term "holder" to include the possessor of

---

[18] Even if article 9, not the common law, controlled the transfer of enforcement rights in a nonnegotiable note, our conclusion would be the same. As seen, article 9 permits the transfer of an instrument by written assignment only. *See* UCC REPORT at 8-9 (discussing UCC 9-203(b)); Whitman, *supra*, at 96.

a blank-indorsed nonnegotiable note flouts the legislative intent behind RCW 61.24.030(7)(a): to communicate to the borrower with certainty that the alleged beneficiary has authority to enforce the note and thus authority to foreclose.[19]

The result is completely different for a negotiable instrument governed by article 3. The holder of a negotiable note by definition possesses the note and has authority to enforce it. Thus, when an alleged beneficiary declares that it is the "holder" of a negotiable note, the borrower knows that the beneficiary has authority to foreclose. This fulfills the legislative purpose behind RCW 61.24.030(7)(a).[20]

---

[19] Defendants argue that in practical terms, even if it is *possible* that the possessor of a nonnegotiable note may not be the PETE (because someone else holds the right to enforce by written assignment), this circumstance is unlikely to occur and would be "contrary to business custom." Br. of Defs. at 40 n.15. That is because article 9 provides an incentive for buyers to take possession of notes in order to perfect their ownership interests. *Id.* (citing Whitman, *supra*, at 99-100). But defendants provide no evidence for their factual assertions about business custom. Since the majority common law rule permits transfer of enforcement rights in a nonnegotiable note by written assignment without delivery, interpreting the DTA's "holder" concept to include the possessor of such a note would not serve RCW 61.24.030(7)(a)'s purpose of communicating to the borrower that they are in fact dealing with the PETE.

[20] Defendants argue that the editors' comments to UCC section 3-104 suggest that article 3's provisions may apply to nonnegotiable instruments by analogy. Br. of Defs. at 30. However, "[w]hether such application is appropriate depends upon the facts of each case." UCC § 3-104 cmt. 2. Here, interpreting "holder" to include the possessor of a nonnegotiable note is not appropriate because doing so would not support the legislative intent behind RCW 61.24.030(7)(a), as discussed above.

The dissent's remaining arguments against interpreting "holder" this way fail. First, the dissent argues that the beneficiary declaration provision in RCW 61.24.030(7)(a) would be "wholly unnecessary" if a beneficiary must be the holder of a negotiable note, because in that case "the foreclosing party would simply produce the note" in order to establish PETE status. Dissent at 4. This argument overlooks the fact that RCW 61.24.030(7)(a) does not require a declaration; it requires proof of holder status, and it provides that a beneficiary declaration is *sufficient*, not necessary, to prove holder status. RCW 61.24.030(7)(a) ("A declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust shall be sufficient proof as required under this subsection."). In other words, the statute already contemplates that a beneficiary could prove holder status in some other way, such as producing the note. The legislature is free to create multiple means by which a beneficiary can prove holder status, and that doesn't make the declaration provision meaningless or unnecessary.

Next, the dissent argues that our interpretation of "holder" somehow "renders the injunction remedy provided in [RCW 61.24.130] meaningless." Dissent at 5. RCW 61.24.130(1) provides, "Nothing contained in this chapter shall prejudice the right of the borrower, grantor, any guarantor, or any person

who has an interest in, lien, or claim of lien against the property or some part thereof, to restrain, on *any proper legal or equitable ground*, a trustee's sale." (Emphasis added.) The dissent fails to explain how holding that a beneficiary must be the holder of a negotiable note renders any portion of this statute meaningless, superfluous, or without effect. Our holding does not prevent a borrower, grantor, guarantor, or other person with an interest in the property from seeking an injunction on any proper legal or equitable ground as provided by the statute.

We conclude that "holder" as used in RCW 61.20.030(7)(a) and RCW 61.24.005(2) means the holder of a negotiable instrument governed by article 3. Thus, we answer no to the second certified question.

## CONCLUSION

We answer both certified questions no. A HELOC agreement as defined in the certified question is not a negotiable instrument because it lacks an unconditional promise to pay a fixed amount of money. And a "holder" under the DTA means the holder of a negotiable instrument governed by article 3. Thus, an alleged beneficiary under the DTA cannot satisfy the prerequisite to nonjudicial foreclosure that it is "the holder of any promissory note or other obligation secured by the deed of trust," RCW 61.24.030(7)(a), by executing a declaration under penalty of perjury attesting that it is the holder of a

HELOC agreement. This conclusion does not deprive lenders or their assigns

of other, judicial, remedies.

Gordon McCloud, J.

WE CONCUR:

Montoya-Lewis, J.

Whitener, J.

Mungia, J.

González, J.

Yu, J.P.T.

*Marquez Vargas v. RRA CP Opportunity Trust 1 et al.*

No. 103735-0

MADSEN, J.P.T.[*] (dissenting)—There is no question that in Washington, a HELOC (home equity line of credit) is typically a loan secured by a deed of trust against real property that may be subject to foreclosure if payments are not made, and the outstanding balance must be repaid according to the loan's repayment terms after the draw period ends. The majority holds that the deed of trust act's (DTA), ch. 61.24 RCW, nonjudicial foreclosure procedure is not available to foreclose a deed of trust securing a HELOC because the statute is limited to negotiable instruments. I disagree with its narrow reading and cannot join the majority for two main reasons.

First, I believe that whether the HELOC agreement at issue here is a negotiable instrument is irrelevant in determining whether an alleged beneficiary under the DTA can satisfy RCW 61.24.030(7)(a) by declaring it is the holder of a promissory note since the statute, by its plain language, is applicable to *both* negotiable and nonnegotiable instruments.

---

[*] Justice Barbara Madsen is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

Second, I believe the use of the term "holder" in RCW 61.24.030(7)(a) is not controlled by the Uniform Commercial Code's (UCC) definition of the term and has a broader meaning based on the differences in the language and purposes of each statute. *See* RCW 62A.1-201(b)(21)(A).

Because the DTA is not limited to negotiable instruments, the only certified question we need to answer is whether an alleged beneficiary under the DTA need only execute a declaration under penalty of perjury attesting that it is the holder of a HELOC agreement pursuant to RCW 61.24.030(7)(a) to show that it is "'the holder of any promissory note or other obligation secured by the deed of trust.'" Doc. 78, at 2 (Ord. Certifying Questions to Wash. Sup. Ct.) (quoting RCW 6.24.030(7)(a)). I would answer in the affirmative. This answer rests on what constitutes a "holder" as used in RCW 61.24.030(7)(a), which I discuss below.

DISCUSSION

The DTA Is Not Limited to Negotiable Instruments

The question of what constitutes a "holder" in RCW 61.24.030(7)(a) is a matter of statutory interpretation. The majority concludes that a "holder" under the statute is limited to a holder as defined in RCW 62A.1-201(b)(21), which governs negotiable notes. I disagree for many reasons, starting with the purposes underlying the UCC and the nonjudicial foreclosure statute.

The UCC provides a structured legal framework related to negotiable instruments by regulating their validity, negotiation, enforcement, and the allocation of rights and

2

defenses among parties. *See* ch. 62A.3 RCW. It is a comprehensive set of laws governing *commercial* transactions. *Uniform Commercial Code*, UNIF. L. COMM'N, https://www.uniformlaws.org/acts/ucc [https://perma.cc/RHR9-JBV8]. States have adopted the code to ensure that businesses can enter into contracts knowing that the terms will be enforced in the same way by courts across the country. *Id*. Section 3 of the code governs negotiable instruments that represent a promise to pay a sum of money to any person who is in possession of the instrument if it is indorsed in blank. *Id*.; ch. 62A.3 RCW. To enforce the note, lawful possession and proper endorsement (where required) are typically necessary.

In contrast, chapter 61.24 RCW provides a method to resolve defaulted loans guaranteed by a deed of trust with definitions and regulations unique to foreclosure of deeds of trust. The DTA includes its own definitions, regulations, and defenses that are very different from those in the UCC. The process of nonjudicial foreclosure relies on the contractual "power of sale" clause in a deed of trust, allowing a trustee to sell the property upon default, not on the existence of a negotiable instrument. RCW 61.24.030(1).

The legislature's intent in adopting the nonjudicial foreclosure statute is markedly different from its adoption of the UCC. Specifically, the legislature found that "[p]rolonged foreclosures contribute to the decline in the state's housing market, loss of property values, and other loss of revenue to the state." LAWS OF 2011, ch. 58, § 1(b).

No. 103735-0
(Madsen, J.P.T., dissenting)

The statute is intended to provide a faster, less expensive way to resolve default on deeds of trust.

With this overview I turn to the meaning of "holder" as used in RCW 61.24.030. "Whenever possible, we interpret the statutory language such that 'no clause, sentence or word shall be superfluous, void, or insignificant.'" *Velazquez Framing, LLC v. Cascadia Homes, Inc.*, 2 Wn.3d 552, 555, 540 P.3d 1170 (2024) (internal quotation marks omitted) (quoting *City of Seattle v. Long*, 198 Wn.2d 136, 148, 493 P.3d 94 (2021)).

First, RCW 61.24.030(7)(a) requires a *declaration* that an alleged beneficiary is a holder of any note.[1] As explained above, enforcement of a negotiable note under the UCC requires possession of the instrument, or satisfaction of the lost-note provisions under RCW 62A.3-309. RCW 62A.3-301. "Holder" status under the UCC is determined by objective facts: possession and proper indorsement (if required). If the legislature intended RCW 61.24.030(7)(a) to apply only to negotiable notes as the majority says, then the required declaration would be wholly unnecessary, adding nothing legally meaningful, since the foreclosing party would simply produce the note.[2] There would be no need for the trustee to provide a sworn statement to establish what the UCC already governs. Instead, the existence of the declaration requirement makes sense only if the

_____

[1] "[F]or residential real property . . . before the notice of trustee's sale is recorded, transmitted, or served, the trustee shall have proof that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust. A declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust shall be sufficient proof . . . ." RCW 61.24.030(7)(a).

[2] Although a beneficiary declaration is sufficient but not necessary to prove that the beneficiary is the holder of any promissory note, the point still stands that where a party could simply produce the note, there is no need for a declaration.

4

legislature anticipated situations where the party enforcing the note is not relying solely on possession of the note.

Second, limiting the meaning of "holder," and therefore the nonjudicial foreclosure statute, to negotiable notes renders the injunction remedy provided in the statute meaningless. Under RCW 61.24.130, borrowers may seek to *enjoin* a trustee's sale based on violations of the DTA. This presupposes that authority to foreclose can be contested. But, under the UCC, if the foreclosing party has possession of a negotiable note indorsed in blank, then enforcement is guaranteed since possession resolves the issue. Or if a negotiable note has a special indorsement, then possession and a proper indorsement resolves the issue. Possession is still required in both scenarios. The majority states that its holding "does not prevent a borrower, grantor, guarantor, or other person" from seeking an injunction on any proper legal or equitable ground. Majority at 52. Although it does not prevent a person or entity from doing so, the remedy is rendered hollow where production of the note is all that it takes to establish enforcement authority.

Further, as the majority notes, in *Brown v. Department of Commerce*, 184 Wn.2d 509, 543, 359 P.3d 771 (2015), this court determined that "[t]he legislature's clear purpose [in enacting RCW 61.24.030(7)(a)] was to ensure the party with the *authority to enforce and modify the note* is the party engaging in mediation and foreclosure." *See* majority at 6. But, under the UCC, a negotiable instrument cannot be materially modified absent a separate agreement by both parties. RCW 62A.3-117.

5

This raises an important question. Why would the legislature create a detailed injunction process, impose presale notice and declaration requirements, and allow challenges to beneficiary status if the relevant question is possession of the negotiable instrument as the UCC provides? The injunction remedy makes sense only if foreclosure authority is not self-proving, and compliance with the DTA involves more than possession. Clearly, including injunction process, imposing presale notice and declaration requirements, and allowing challenges to beneficiary status are necessary only if the DTA also applies to nonnegotiable instruments.

Third, the term "holder" is used throughout the DTA, outside the context of negotiable instruments. *See* RCW 61.24.040(1)(b)(iii)-(v), (2)(d). If a statute's meaning is plain on its face, then we give effect to that plain meaning. "The 'plain meaning' of a statutory provision is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

The majority fails to analyze how the legislature's repeated use of the term "holder" outside the context of negotiable instruments makes a difference to its ultimate conclusion. I believe it demonstrates that if the legislature intended the term to have a special meaning related only to negotiable instruments, it would have made a distinction in using that term, particularly when there is both a general and technical meaning to the term. Had the legislature intended to limit "holder" in RCW 61.24.030(7)(a) to the

6

definition of "holder" in the UCC, it would have cross-referenced RCW 62A.1-201(b)(21), which defines "holder" with respect to negotiable instruments.

In sum, the majority's interpretation of "holder" as applying only to UCC holders imposes the UCC's formal limitations into a statute that is textually and structurally broader and that serves an entirely different purpose. Nothing in the DTA's language indicates an intent to confine its operation to instruments meeting the technical requirements of negotiability. To read such a restriction into the DTA statute creates arbitrary distinctions among economically identical transactions. The better interpretation is that the DTA applies to transferable payment obligations generally, not merely those classified as negotiable instruments. The plain language of the statute supports this interpretation.

Construing the statute to apply only to negotiable instruments collapses the DTA into the UCC and many critical sections of the DTA become superfluous. Where we already have a statutory scheme regulating nonjudicial foreclosure, it is not necessary to look beyond the DTA to determine what was meant by the term "holder." Other courts in states that use deeds of trust in nonjudicial foreclosures do not look to the UCC for assistance when they have a statutory scheme regulating nonjudicial foreclosure. *See Debrunner v. Deutsche Bank Nat'l Tr. Co.*, 204 Cal. App. 4th 433, 441, 138 Cal. Rptr. 3d 830 (2012) ("we are not convinced that the cited sections of the California Uniform Commercial Code (particularly § 3301) displace the detailed, specific, and comprehensive set of legislative procedures the Legislature has established for

nonjudicial foreclosures"); *Hogan v. Wash. Mut. Bank, NA*, 230 Ariz. 584, 586, 277 P.3d 781 (2012) ("The UCC does not govern liens on real property. The trust deed statutes do not require compliance with the UCC before a trustee commences a non-judicial foreclosure." (citation omitted)); *see also* Dale A. Whitman, *How Negotiability Has Fouled Up the Secondary Mortgage Market, and What to Do About It*, 37 PEPP. L. REV. 737, 762-63 (2010) (hereinafter Whitman, *How Negotiability Has Fouled Up*) ("U.C.C. Article 3 has no application to nonnegotiable notes").

Instead, the legislature's intent in requiring the beneficiary declaration should guide our interpretation of the term "holder." The legislature's intent was to ensure that the borrowers know who they should be interacting with in the event of a foreclosure and who has the authority to foreclose. *See* S.B. REP. ON S.B. 5810, at 3-4, 61st Leg., Reg. Sess. (Wash. 2009). In this context, where the statute applies to both negotiable and nonnegotiable notes, the more reasonable interpretation is to conclude that "holder" means the person or entity with the power to foreclose.

As the majority explains, enforcement rights in negotiable notes can be transferred only by delivery of possession of the note itself; meanwhile it seems possible that nonnegotiable notes may be transferred by delivery of possession or by a separate document of assignment. Dale A. Whitman & Drew Milner, *Foreclosing on Nothing: The Curious Problem of the Deed of Trust Foreclosure Without Entitlement To Enforce the Note*, 66 ARK. L. REV. 21, 31 (2013). Despite this difference, "[a]s a practical matter, there is little functional difference between secondary market sales of negotiable and

nonnegotiable notes, despite the formal distinctions . . . between Article 3 and the common law. The system works as well for nonnegotiable notes as it does for negotiable notes." Dale A. Whitman, *Transferring Nonnegotiable Mortgage Notes*, 11 FLA. A&M U. L. REV. 63, 100 (2015). Moreover, even if a note is assigned, possession of the note is still incentivized so that the assignee can have superpriority benefits under article 9 of the UCC. *Id*. at 99.

Thus, the power to foreclose may derive from actual possession of the note for both negotiable and nonnegotiable notes or through a written assignment for nonnegotiable notes. However, if a person or entity without the power or authority to initiate a nonjudicial foreclosure proceeded to do so, borrowers are not without any remedies. They may file suit to enjoin the sale. *See* RCW 61.24.130 ("Nothing contained in this chapter shall prejudice the right of the borrower . . . to restrain, on any proper legal or equitable ground, a trustee's sale.").

The Legislature's 2018 Amendment Demonstrates That It Did Not Acquiesce in This Court's Prior Decisions

As previously discussed, the DTA makes no distinction between negotiable and nonnegotiable instruments, and if the legislature had intended to limit nonjudicial foreclosure to negotiable instruments it would have done so. Instead, RCW 61.24.020 provides that "[a] deed conveying real property to a trustee in trust to secure the performance of an obligation of the grantor or another to the beneficiary may be foreclosed by trustee's sale." The only exception is for a deed of trust conveying real

property that is used principally for agricultural purposes. No other restriction is included. Thus, the DTA focuses on whether a deed of trust secures a promissory note or other obligation, rather than on the negotiability of that instrument.

Although the legislature did not define the term "holder" in the DTA, it defined the term "beneficiary." The DTA defines "beneficiary" broadly: it "means the holder of *the instrument or document* evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation." RCW 61.24.005(2) (emphasis added). Under the UCC, a "holder" with respect to negotiable instruments means "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." RCW 62A.1-201(b)(21)(A).

Prior to the 2018, RCW 61.24.030(7)(a) provided that "[a] declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the *actual* holder of *the* promissory note or other obligation secured by the deed of trust shall be sufficient proof" that the beneficiary is the holder for purposes of serving a notice of sale. LAWS OF 2012, ch. 185, § 9 (emphasis added).

Under *Bain v. Metropolitan Mortgage Group, Inc.*, 175 Wn.2d 83, 104, 285 P.3d 34 (2012), only a holder has the requisite authority to act as beneficiary and a holder must possess the promissory note in line with the UCC's definition of "holder" and "person entitled to enforce." The court concluded that the DTA should be guided by the UCC's definitions. *Id*. Both *Lyons v. U.S. Bank National Association*, 181 Wn.2d 775, 336 P.3d

10

1142 (2014), and *Trujillo v. Northwest Trustee Services, Inc.*, 183 Wn.2d 820, 355 P.3d 1100 (2015), relied on the holding in *Bain* to reach their decisions. They concerned *ambiguous* beneficiary declarations stating that the alleged beneficiary "is the actual holder of the promissory note or other obligation evidencing the above-referenced loan *or has requisite authority under RCW 62A.3–301 to enforce said obligation.*" *Lyons*, 181 Wn.2d at 780 (emphasis added). The issue was the additional language "or has requisite authority" because it was unclear whether the alleged beneficiary was the "actual holder" as was required by the former statute or whether the beneficiary was potentially a nonholder with the authority to enforce the obligation. In *Lyons* and *Trujillo* the beneficiary declarations were insufficient because it was unclear whether the alleged beneficiary was in possession of the note and thus was an "actual holder."

After these cases were decided, the legislature amended the statute in 2018 to say that "[a] declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the . . . holder of . . . *any* promissory note or other obligation secured by the deed of trust shall be sufficient proof as required under this subsection." LAWS OF 2018, ch. 306, § 1 (emphasis added). Thus, it removed the word "actual" before holder and changed "the" promissory note to "any" promissory note.

To support its position, the majority states that the legislature's 2018 amendment to RCW 61.24.030(7)(a) shows that the legislature has acquiesced to this court's current interpretation of the term "holder." Majority at 40-42. That conclusion is unsupportable. Rather, changing "the" promissory note to "any" promissory note and the legislature's

11

purpose in requiring a declaration, suggests that its intent was to *broaden* the meaning of the term "holder," not to acquiesce in those prior holdings that significantly narrow the reach of the statute.[3]

These revisions are telling. *Any* promissory note encompasses both negotiable and nonnegotiable promissory notes. When interpreting statutes, "the court should assume that the legislature means exactly what it says." *City of Snohomish v. Joslin*, 9 Wn. App. 495, 498, 513 P.2d 293 (1973). If the legislature intended to limit the statute to negotiable instruments, what would have been the purpose of changing the statute to say "any" promissory note? Adding the word "any" actually conflicts with the UCC's definition since "holder" under the UCC is limited to *only* negotiable instruments, not to any promissory note. "[A]ny promissory note" can encompass both negotiable and nonnegotiable promissory notes, suggesting the legislature intended a broader definition of "holder" than the UCC's definition. RCW 61.24.030(7)(a).

The majority attempts to diminish the impact of the legislature's change of the word "the" to "any" by stating that the legislature simply made the change to make the sentence conform to the language used in the first sentence of the same provision. The first sentence also used the descriptor "any" before the term "promissory note." *See id*. This does not change the fact that Washington courts have construed "'[a]ny' [to] mean[]

---

[3] In addition to predating the 2018 amendment to the statute, which broadened the term "holder," the shortfall in *Bain* is that it did not analyze negotiability before deciding the meaning of "beneficiary" by looking at the UCC's definitions.

'every' and 'all.'" *State v. Westling*, 145 Wn.2d 607, 611, 40 P.3d 669 (2002) (citing

*State v. Smith*, 117 Wn.2d 263, 271, 814 P.2d 652 (1991)); *see Jong Choon Lee v.*

*Hamilton*, 56 Wn. App. 880, 884, 785 P.2d 1156 (1990); *State v. Harris*, 39 Wn. App.

460, 463, 693 P.2d 750 (1985). "The word 'any' is a broad and inclusive term with

respect to subject matter." *S.L. Rowland Constr. Co. v. Beall Pipe & Tank Corp.*, 14 Wn.

App. 297, 306, 540 P.2d 912 (1975). The majority robs the term "any" of its meaning

with its current interpretation that the provision is limited to negotiable notes. The

legislature could have changed the descriptor in the first sentence from "any" to "the,"

but instead it changed "the" to "any" in the second sentence. This clearly indicates that

the legislature wanted it to apply to *any* promissory note.

Although not binding, a prior case from the Court of Appeals discusses

nonnegotiable notes secured by a deed of trust. In *Rodgers v. Seattle–First National*

*Bank*, 40 Wn. App. 127, 129, 697 P.2d 1009 (1985), Columbia Pacific Mortgage Inc.

(CPM), the lender, made a loan to the borrowers (the Nobles) to finance construction of a

house. The Nobles gave CPM a nonnegotiable note and deed of trust to secure the note.

*Id*. CPM assigned the note and deed of trust to Seattle–First National Bank, who took

possession of the note and recorded the assignment of the deed of trust. *Id*. "The note

provided payments were to be made to CPM in Richland 'or such other place … as the

*holder* of this Note may designate in writing from time to time.'" *Id*. at 130 (alteration in

original) (emphasis added). Though not explicitly stated, the language in the note implies

13

that someone can be a "holder" of a nonnegotiable instrument and that enforcement authority can be transferred.[4]

The legislature's purpose in requiring a declaration also supports this interpretation. Its purpose was to ensure that the party with the authority to enforce the note was the one initiating the nonjudicial foreclosure. In the case of negotiable notes, a person may be entitled to enforce a note under three different circumstances. *See* RCW 62A.3-301(i)-(iii).[5] One exception to the requirement of possessing the note includes if a person is not in possession, so they are not a "holder" as defined in RCW 62A.1-201(b)(21)(A)-(C), but one who is entitled to enforce the instrument pursuant to RCW 62A.3-309 or 62A.3-418(d). *Id*. Meanwhile, "[t]he right to enforce a nonnegotiable note *can* be transferred by physical delivery, but it can also be transferred by a separate document of assignment." Whitman, *How Negotiability Has Fouled Up*, *supra*, at 758-59. Therefore, a declaration is needed by the alleged beneficiary under the penalty of perjury.

---

[4] The sole issue in *Rodgers* was "whether an obligor who had actual notice of an assignment of a deed of trust may be discharged upon payment to the assignor when the assignee would have told the obligor to pay the assignor if the obligor had inquired." 40 Wn. App. at 128. The court discussed how "one paying a note, either negotiable or nonnegotiable, should demand production of it upon payment or risk having to pay again to the assignee." *Id*. at 132. However, it noted that the rule regarding production of the note has been severely criticized since "'[t]oday the note is usually unavailable when the final payment is made.'" *Id*. at 132 n.3 (quoting GEORGE E. OSBORNE, GRANT S. NELSON & DALE A. WHITMAN, REAL ESTATE FINANCE LAW 346 n.7 (1979)). It then provided three exceptions which may discharge an obligor in the mortgage context, such as if a plausible explanation is given for not producing the documents or if an assignor was given authority to collect payments and thus be the agent of the assignee. *Id*. at 133.

[5] "[N]egotiability requires that, for every loan sold on the secondary market, the original promissory note must be delivered to the purchaser. In a national or global market, this requirement is extremely inefficient and inconvenient, and in recent years, has been widely ignored, much to the detriment of mortgage purchasers." Whitman, *How Negotiability Has Fouled Up, supra*, at 740.

Previously, this court agreed that the DTA should be guided by UCC definitions without analyzing the consequences when a note is nonnegotiable. Following the addition of the word "any" as explained above, reliance on the UCC's definitions is unnecessary and erroneous.[6] We do not need to look beyond the DTA to determine the meaning of "holder," and applying the UCC's definition of holder with respect to negotiable instruments is not practical where the DTA applies to both negotiable and nonnegotiable instruments.

Even if we hold that possession of the note is required to be a holder, RRA CP Opportunity Trust 1 possessed the original promissory note indorsed in blank and provided a beneficiary declaration that is sufficient under RCW 61.24.030(7)(a). As a result, it should be able to initiate nonjudicial foreclosure proceedings.

Nonjudicial Foreclosures May Benefit Borrowers

Lastly, as the majority notes, labeling nonjudicial foreclosures as providing less protection to borrowers is an outdated concept. As discussed previously, borrowers can enjoin the nonjudicial foreclosure under the DTA and raise related claims in court. Furthermore, failure to bring a civil action to enjoin a sale does not constitute waiver if the claims are relating to damages asserting fraud, misrepresentation, violations of Title

---

[6] The majority states that I argue that *Bain* is no longer good law and should be overruled, an argument that no one has raised. Majority at 44. *Bain* agreed to look to UCC definitions to interpret the DTA. 175 Wn.2d at 104. It did so in reaching its holding that "only the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary" under the DTA. *Id*. at 89. I do not disagree with its holding that a holder is a beneficiary. Rather, the point is that the term "holder" should not be limited to the UCC's definition, which is an argument raised by the defendants. *Bain* did not analyze the issue of whether an entity may be a holder of a nonnegotiable instrument under the DTA and the legislature amended the statute after *Bain* as discussed above. There is no need to overrule *Bain*. I simply advocate for applying the plain language of the statute as revised post-*Bain*.

15

19 RCW, failure of a trustee to comply with chapter 61.24 RCW, and a violation of RCW 61.24.026. *See* RCW 61.24.127(1)(a)-(d).

Additionally, the legislature has amended the DTA to provide borrowers facing nonjudicial foreclosure with a mediation program to help prevent borrowers from losing their homes at no cost to the borrower. *See* RCW 61.24.163. A recent quarterly report on the mediation program shows that of the 69 cases referred to mediation, 58 agreements were reached and 49 homes were retained. WASH. STATE DEP'T OF COM., QUARTERLY PERFORMANCE REPORT, FY25 QUARTER 3 (Jan.-Mar. 2025).[7] The addition of the mediation program clearly suggests the legislature believes the nonjudicial foreclosure process protects both lenders and borrowers.

The DTA "balances the interests of borrowers and lenders. It provides a comparatively inexpensive mechanism for lenders to foreclose on real property pledged to secure a debt through nonjudicial foreclosure, making certain types of loans easier for borrowers to obtain because lenders have faster recourse if the loan is not repaid." *Wash. Fed. v. Harvey*, 182 Wn.2d 335, 336-337, 340 P.3d 846 (2015) (footnote omitted). Moreover, it limits recovery to whatever is recouped from the nonjudicial foreclosure and generally does not allow the lender to pursue a deficiency judgment against the borrower. *Id*. Therefore, the lender "must be satisfied with what it gets." *Id*. Whether nonjudicial foreclosure is better or worse for a borrower may depend on the specific circumstances, including the value of the property at issue, the outstanding debt, and the desire for

---

[7] https://deptofcommerce.box.com/s/z9sov8mwh6lelqormtdwvhma08cymbdo

antideficiency protection. *See* RCW 61.24.100(1) ("a deficiency judgment shall not be obtained on the obligations secured by a deed of trust against any borrower . . . after a trustee's sale under that deed of trust"). It may also depend on whether the borrower wants to avoid the legal costs associated with a judicial foreclosure as well as the accumulation of interest if judicial foreclosures take a lengthier amount of time. Whether it is of benefit to a lender also entails similar considerations since it may not recoup all that is owed in exchange for a more efficient and less expensive process. In other words, nonjudicial foreclosure can work to the benefit of both the holder of a note and the borrower.

With these considerations in mind, I respectfully dissent.


_____
Madsen, J.P.T.


_____
Stephens, C.J.


_____
Johnson, J.


17